[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 94-2982

D.C. Docket No. 85-1770-CIV-T-17

INDUSTRIAL RISK INSURERS, BARNARD
& BURK GROUP, INC., BARNARD AND
BURK ENGINEERS AND CONSTRUCTORS, INC.,
ISI, INC, AMERICAN HOME ASSURANCE CO.,

Defendants--Third-Party-Plaintiffs--Appellants,

versus

M.A.N. GUTEHOFFNUNGSHÜTTE GmbH,

Third-Party-Defendant--Appellee--Cross-Appellant.

No. 94-2530

D.C. Docket No. 85-1770-CIV-T-17

HOLLAND & KNIGHT, MARK E. GRANTHAM,

Appellants,

versus

INDUSTRIAL RISK INSURERS, BARNARD
& BURK GROUP, INC., BARNARD AND
BURK ENGINEERS AND CONSTRUCTORS, INC.,
ISI, INC, AMERICAN HOME ASSURANCE CO.,

Defendants--Third-Party-Plaintiffs--Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(May 22, 1998)**

Before TJOFLAT and EDMONDSON, Circuit Judges, and NANGLE*, Senior
District Judge.

_____

*Honorable John F. Nangle, Senior U.S. District Judge for the
Eastern District of Missouri, sitting by designation.

TJOFLAT, Circuit Judge:

Industrial Risk Insurers, Barnard and Burk Group, Inc., Barnard and Burk Engineers and Constructors, Inc., ISI, Inc., and American Home Assurance Company[1] appeal from the district court's denial of their motion to vacate an international commercial arbitration award. On cross-appeal, respondent M.A.N. Gutehoffnungshütte GmbH ("MAN GHH") challenges the district court's denial of pre-judgment interest. In a separate appeal, MAN GHH challenges the district court's imposition of sanctions under Federal Rule of Civil Procedure 11. We affirm the district court's denial of the motion to vacate the award. We vacate the district court's denial of prejudgment interest, however, and remand for reconsideration of that issue. We also reverse the district court's imposition of Rule 11 sanctions.

I.

This complex commercial litigation began over a decade ago, in 1985.[2] Nitram, Inc., a Florida nitric acid manufacturer, contracted with Barnard and Burk Group, Inc., a Texas corporation, for the provision and installation of a tail gas expander in Nitram's Tampa, Florida nitric acid manufacturing

_____

[1]  The only interest of American Home Assurance in this appeal is that it is among the parties against whom costs were imposed by the arbitral panel. As stated infra part I.C, we affirm that costs award. We omit any further reference to American Home Assurance for clarity's sake.

[2]  We recite only those facts and prior proceedings necessary to an understanding of the issues raised on appeal.

3

plant.[3]  Barnard and Burk Group then engaged Barnard and Burk Engineers and Constructors, Inc., a Louisiana corporation, to perform the design engineering work for the installation, and engaged ISI, a Louisiana corporation, to perform the construction work.[4] (We refer hereinafter to the Barnard and Burk Group, Barnard and Burk Engineers and Constructors, and ISI, collectively, as "Barnard and Burk").  Barnard and Burk Group in turn contracted to purchase the tail gas expander from M.A.N. Maschinenfabrik Augsburg-Nürnberg AG, a German turbine manufacturer.  MAN GHH, the Appellee/Cross-Appellant in this appeal, is a spin-off corporation of, and the successor-in-interest to, M.A.N. Maschinenfabrik Augsburg-Nürnberg AG. MAN GHH was responsible for designing, manufacturing, and delivering a functional tail gas expander and for providing technical guidance regarding its installation; Barnard and Burk was responsible for the piping required to put the expander into service.

The tail gas expander was installed in the Tampa plant in late 1984 and early 1985.  On January 16, 1985, during start-up procedures, moving and stationary components of the expander came in contact with each other.  This caused a "wreck" of the

---

[3]  A tail gas expander is essentially a turbine which generates electricity from waste gasses given off in the nitric acid manufacturing process.

[4]  Barnard and Burk Engineers and Constructors, Inc., and ISI, Inc., are both wholly-owned subsidiaries of Barnard and Burk Group.

4

machine, deforming its rotor, scarring its stator casing and destroying seals. Parts of the expander were returned to Germany for repair and the piping was modified. On March 23, 1985, during a second attempt to start the turbine, the expander suffered a second wreck. See Nitram, Inc. v. Industrial Risk Insurers et al., 848 F.Supp. 162, 164 (M.D. Fla. 1994). The machine was rebuilt again and after further piping modifications, it ran successfully; the two wrecks, however, had resulted in months of down time and millions of dollars in damages.

Nitram had purchased business risk insurance from Industrial Risk Insurers ("IRI"), a Hartford, Connecticut, consortium of insurance companies that provides business risk insurance to certain large manufacturing, processing, and industrial concerns.[5] IRI refused to pay Nitram for the losses caused by the first wreck under Nitram's business risk policy with IRI, arguing that the wrecks were caused by Barnard and Burk's poor design and defective piping, and that the losses due to the wrecks therefore were not covered by the policy. IRI acknowledged that the policy did cover some of the losses due to the March wreck and made payment for those losses under the policy. In October of 1985, Nitram sued both IRI and Barnard and Burk in Florida state court, arguing inter alia that one of them

---

[5] Several other companies were parties to the litigation in the district court in various capacities, but were not parties to the arbitral proceeding that gives rise to this appeal, and are consequently not parties to this appeal. We omit reference to them for clarity's sake.

5

had to pay for the remaining losses: if Barnard and Burk was at fault for the wrecks, Nitram argued, then Barnard and Burk was liable; if Barnard and Burk was not at fault, then the loss due the wrecks was covered by Nitram's policy with IRI. IRI, as Nitram's subrogee, cross-claimed against Barnard and Burk for the amount of the partial payment IRI had made to Nitram under its policy. Defendants IRI and Barnard and Burk then removed the case to the district court on grounds of diversity, and Barnard and Burk counterclaimed against Nitram, alleging various breaches of contract by Nitram.

Barnard and Burk proceeded to file a third-party claim against MAN GHH, asserting that MAN GHH's faulty expander, and not Barnard and Burk's design or piping, caused the two wrecks, and that MAN GHH was therefore required to indemnify Barnard and Burk for various costs and for lost business. Nitram then settled with IRI, and its claims against IRI were dismissed. As a result, IRI was subrogated to Nitram's claims against Barnard and Burk.

In April of 1987, MAN GHH moved to compel arbitration of Barnard and Burk's third-party claim against it, pursuant to an arbitration provision in its contract with Barnard and Burk for the design, manufacture, and purchase of the expander. That provision, as amended, provided for binding arbitration in Tampa under the rules of the American Arbitration Association and under Florida law. The district court ordered arbitration pursuant to this provision in July of 1987.

6

In December of 1987, Nitram amended its complaint to state claims directly against MAN GHH. Nitram brought tort and breach-of-warranty claims alleging that the expander was defectively designed and manufactured by MAN GHH, and demanding indemnification in case Nitram was held liable to Barnard and Burk. IRI, as Nitram's subrogee, added a cross-claim against MAN GHH for good measure. In August of 1988, MAN GHH moved for, and the district court ordered, arbitration of these claims as well.

Barnard and Burk then settled with Nitram, and with IRI, leaving the arbitrators to determine:

1. Barnard and Burk's third-party complaint against MAN GHH;

2. Nitram's complaint against MAN GHH; and

3. IRI's cross-claim against MAN GHH as Nitram's subrogee.

All of these claims turned on whether the two wrecks were caused by MAN GHH's expander or by Barnard and Burk's design and piping. The arbitration panel heard testimony in January and March of 1993.

Also in March of 1993, while the arbitration proceedings were pending, Barnard and Burk moved for Rule 11 sanctions against MAN GHH, arguing that MAN GHH had improperly attempted to relitigate the issue of the arbitral venue, which had already been decided by the district court. The district court agreed and imposed sanctions upon MAN GHH's counsel in July of 1993. See Nitram, Inc. v. Industrial Risk Insurers, 149 F.R.D. 662 (M.D. Fla. 1993).

In May of 1993, the arbitrators returned an award in favor

7

of MAN GHH, concluding that Barnard and Burk's design and piping, not MAN GHH's tail gas expander, had caused the two wrecks.  The panel also awarded MAN GHH costs and conversion rate compensation.

Barnard and Burk then moved the district court to vacate the arbitration awards, on grounds that the prinicipal arbitral award was "arbitrary and capricious" and that the arbitration panel improperly and prejudicially admitted certain testimony and evidence, and that the costs award and conversion rate compensation award should be vacated along with the principal award.  The district court denied the motion and confirmed the panel's awards.  See Nitram, 848 F.Supp. 162.  Barnard and Burk now appeals the denial of that motion, asking four questions:

1. Whether the arbitrators' failure to conduct the arbitration in strict conformity with the agreement of the parties required the district court to vacate the principal arbitral award;

2. Whether the award should be vacated because of the panel's admission of 1) a technical report that was proffered at a relatively late date in the proceedings, and 2) the testimony of an expert who had been previously retained by IRI and who provided opinions against Barnard and Burk's interests;

3. Whether the district court abused its discretion in determining that the arbitration awards were not "arbitrary and capricious;" and

4. Whether the conversion rate and costs awards should be

8

vacated along with the principal award.

On cross-appeal, MAN GHH challenges the district court's refusal to award to MAN GHH prejudgment interest from the date of the last arbitral award through the date of the district court's judgment confirming the arbitral award. MAN GHH also brings a separate appeal challenging the district court's imposition of Rule 11 sanctions.

I.

As a threshold matter, we must determine the source of our jurisdiction. We must inquire <u>sua</u> <u>sponte</u> into the source of our jurisdiction whenever it might be in question. <u>See</u> <u>Miscott Corp.</u> <u>v. Zaremba Walden Co.</u>, 848 F.2d 1190, 1192 (11th Cir. 1988). The district court proceeded in the belief that its jurisdiction was grounded in diversity, and that its treatment of the arbitral proceedings was therefore controlled by Chapter 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16 (1994), which covers domestic arbitral proceedings. We conclude that the district court was in error, and hold that the case is controlled by Chapter 2 of the FAA, 9 U.S.C. §§ 201-208, which covers international arbitral proceedings.

The instant case presents an issue of first impression in this court: Do the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), and thus the provisions of Chapter 2 of the FAA, govern an arbitral award granted to a foreign corporation by an

arbitral panel sitting in the United States and applying American federal or state law?  We hold that they do.

The New York Convention was drafted in 1958 under the auspices of the United Nations.  See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, opened for signature June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 3.  The United States acceded to the treaty in 1970, and Chapter 2 of the FAA was passed that same year.  The purpose of the New York Convention, and of the United States' accession to the convention, is to "encourage the recognition and enforcement of international arbitral awards," Bergesen v. Joseph Muller Corp., 710 F.2d 928, 932 (2d Cir. 1983), to "relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that [is] speedier and less costly than litigation."  Ultracashmere House, Ltd. v. Meyer, 664 F.2d 1176, 1179 (11th Cir. 1981). See also generally Leonard V. Quigley, "Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards," 70 Yale L.J. 1049 (1961) (recounting the deliberations of the New York Convention and describing accession's benefits for the U.S.).  The Convention, and American enforcement of it through the FAA, "provide[] businesses with a widely used system through which to obtain domestic enforcement of international commercial arbitration awards resolving contract and other transactional disputes, subject only to minimal standards of domestic judicial review for basic fairness and

10

consistency with national public policy." G. Richard Shell, "Trade Legalism and International Relations Theory: An Analysis of the World Trade Organization," 44 Duke L.J. 829, 888 (1995).

The New York Convention is incorporated into federal law by the FAA, which governs the enforcement of arbitration agreements, and of arbitral awards made pursuant to such agreements, in federal and state courts. See Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 269-73, 115 S.Ct. 834, 837-39, 130 L.Ed.2d 753 (1995). Chapter 2 of the Act, 9 U.S.C. §§ 201-208, mandates the enforcement of the New York Convention in United States courts. See 9 U.S.C. § 201. Chapter 2 generally establishes a strong presumption in favor of arbitration of international commercial disputes, see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 638-40, 105 S.Ct. 3346, 3359-61, 87 L.Ed.2d 444 (1985), and creates original federal subject-matter jurisdiction over any action arising under the Convention. See 9 U.S.C. § 203; H.R. Rep. No. 91-1181, at 2 (1970), reprinted in 1970 U.S.C.C.A.N. 3601, 3602 ("Section 203 gives original jurisdiction over any action or proceeding falling under the Convention to the district courts of the United States regardless of the amount in controversy."). As an exercise of the Congress' treaty power and as federal law, "[t]he Convention must be enforced according to its terms over all prior inconsistent rules of law." Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l. Oil Co. (Pemex), 767 F.2d 1140, 1145 (5th Cir. 1985).

11

The Convention by its terms applies to only two sorts of arbitral awards: 1) awards made in a country other than that in which enforcement of the award is sought, and 2) awards "not considered as domestic awards in" the country where enforcement of the award is sought.  It is apparent that the arbitral award at issue in the instant case does not fall within the first category.  We hold, however, that it does fall within the second category.  Section 202 of the FAA provides that all arbitral awards arising out of commercial relationships fall under the Convention, except for those awards that "aris[e] out of . . . a [commercial] relationship which is entirely between citizens of the United States . . . ."  9 U.S.C. § 202.[6]  We read this provision to define all arbitral awards not "entirely between citizens of the United States" as "non-domestic" for purposes of Article I of the Convention.  We join the First, Second, Seventh,

_____

[6]  The entire section reads:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.  For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C. § 202.

and Ninth Circuits in holding that arbitration agreements and awards "not considered as domestic" in the United States are those agreements and awards

> which are subject to the Convention not because [they were] made abroad, but because [they were] made within the legal framework of another country, e.g., pronounced in accordance with foreign law <u>or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction</u>. We prefer this broad[] construction because it is more in line with the intended purpose of the treaty, which was entered into to encourage the recognition and enforcement of international arbitration awards.

<u>Bergesen</u>, 710 F.2d at 932 (emphasis added) (internal citation omitted); <u>see</u> <u>also</u> <u>Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" US, Inc.</u>, 126 F.3d 15, 18-19 (2d Cir. 1997); <u>Jain v. de Méré</u>, 51 F.3d 686, 689 (7th Cir. 1995) (stating that the New York Convention and § 202 "mandate[] that any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls within the Convention"); <u>Ministry of Defense of the Islamic Republic of Iran v. Gould Inc.</u>, 887 F.2d 1357, 1362 (9th Cir. 1989) (holding that New York Convention applies when arbitral "award (1) . . . arise[s] out of a legal relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope", and that the award at issue was "obviously not domestic in nature because Iran [was] one of the parties to the agreement"); <u>Ledee v. Ceramiche Ragno</u>, 684 F.2d 184, 186-87 (1st Cir. 1982) (stating that Chapter 2 mandates enforcement of a

13

written commercial arbitral agreement when one of the parties to the agreement is not an American citizen). Specifically for purposes of the case sub judice, we hold that an arbitral award made in the United States, under American law, falls within the purview of the New York Convention--and is thus governed by Chapter 2 of the FAA--when one of the parties to the arbitration is domiciled or has its principal place of business outside of the United States.

MAN GHH is a German corporation. The arbitral award granted to it by the Tampa panel is therefore non-domestic within the meaning of § 202 of the FAA and article 1 of the New York Convention.[7] We therefore hold federal subject-matter jurisdiction over this appeal.

## II.

Having established the source of our jurisdiction, we move to address the appeal on the merits. The Tampa panel's arbitral award must be confirmed unless appellants can successfully assert one of the seven defenses against enforcement of the award enumerated in Article V of the New York Convention.[8] See

---

[7] The appellants argue that the award at issue does not fall under the Convention because MAN GHH's American subsidiary was also a party to the arbitration. The presence of the subsidiary does not, however, take the award out of the purview of the Convention, so long as the foreign parent was a party to the proceeding.

[8] Article V reads:

1. Recognition and enforcement of the award may be

14

refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

15

<u>Imperial Ethiopian Gov't v. Baruch-Foster Corp.</u>, 535 F.2d 334, 335-36 (5th Cir. 1976);[9] <u>see</u> <u>also</u> <u>National Oil Corp. v. Libyan Sun Oil Co.</u>, 733 F. Supp. 800, 813 (D. Del. 1990).  The appellants bear the burden of proving that any of these seven defenses is applicable.  <u>See</u> <u>Imperial Ethiopian Gov't</u>, 535 F.2d at 336.

Only two of the seven enumerated defenses might apply to the instant case.  The first is that found in Article V(1)(d), which provides that a court may refuse to confirm an international arbitral award if "the arbitral procedure was not in accordance with the agreement of the parties."  The second is that found in Article V(2)(b), which provides that a court may refuse to enforce an arbitral award if "the recognition or enforcement of the award would be contrary to the public policy of" the country where enforcement is sought.

The appellants argue that the procedures of the Tampa panel were not in accordance with the parties' arbitration agreement,[10]

---

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. 5, <u>opened</u> <u>for</u> <u>signature</u> June 10, 1958, 21 U.S.T. 2517, 2520, 330 U.N.T.S. 3, <u>reprinted</u> <u>in</u> 9 U.S.C.A. § 201 note (West supp. 1997).  The New York Convention's enumeration of defenses against enforcement is exclusive.  <u>See</u> part II.C, <u>infra</u>.

[9]  In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[10]  The appellants make this assertion in support of their argument that the arbitration proceedings did not conform to the requirements of Chapter 1 the FAA.  The nonconformity of arbitral procedures to the agreement of the parties "is a defense under both the [FAA] and the New York Convention.  The wording is

16

and that the award therefore should not have been confirmed. They argue that the panel should not have considered the contents of a technical report on the wrecks provided by the German technical institute Rheinisch-Westfälischer Technischer Überwachung Verein (the "TÜV report"), because that report was provided to the appellants at a relatively late date, very shortly before the proceedings began. In considering that report, the appellants argue, the arbitration panel violated the rules of the American Arbitration Association, which were the agreed-upon rules of procedure for the arbitration. The appellants also assert that the panel should not have heard the testimony of Donald Hansen, a piping expert who had previously been retained by Respondent IRI to inspect the tail gas expander onsite at the Tampa plant after the first wreck and who was directly involved in the redesign of the expander before the second wreck. Allowing this testimony, the appellants argue, violated "the well-established public policy protecting . . . fundamental principles of fairness and professional conduct." The appellants also assert a defense that is not enumerated by the New York Convention: that the arbitral award should be

---

slightly different but there is no reason to think the meaning different." Lander Co. v. MMP Invs., Inc., 107 F.3d 476, 481 (7th Cir. 1997) (internal citation omitted). We therefore treat the appellants' argument that the nonconformity of the arbitral procedures to the agreement of the parties violated Chapter 1 of the FAA as an argument that that nonconformity was a violation of the New York Convention and Chapter 2. Likewise, we treat the appellants' argument that the admission of Hansen's testimony was a violation of public policy warranting vacatur of the award under Chapter 1 as an argument for vacatur under Chapter 2.

17

vacated on the ground that it is "arbitrary and capricious."

We review de novo the district court's determinations that the procedures observed by the arbitrators were in accordance with the agreement of the parties, that the admission of Hansen's testimony was not violative of public policy, and that the award was not "arbitrary and capricious." See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947-49, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995) (requiring de novo review of questions of law involved in a district court's refusal to vacate an arbitral award). We hold that the admission of the TÜV report was in accordance with the AAA rules and therefore with the agreement of the parties. We also hold that the admission of Hansen's testimony was not a violation of public policy of the sort required to sustain a defense under the New York Convention. We further hold that no defense against enforcement of an international arbitral award under Chapter 2 of the FAA is available on the ground that the award is "arbitrary and capricious," or on any other grounds not specified by the Convention.

A.

Rule 3 of the AAA's Supplementary Procedures for International Commercial Arbitration provides that

> [a]t the request of any party, the AAA will make arrangements for the exchange of documentary evidence or lists of witnesses between the parties. In international cases, it is important that parties be able to anticipate what will transpire at the hearing.

18

By cooperating in an exchange of relevant information, the parties can avoid unnecessary delays.

The TÜV report was provided to the appellants on Jan. 8, 1993--the Friday before the Monday when the arbitration proceedings began--and was not admitted into evidence by the arbitrators until March 26, 1993. The appellants objected to its admission at that time and were allowed to cross-examine Hansen about the institute's report and about his conclusions based on it. The appellants also rebutted Hansen's testimony with testimony from experts of their own.

MAN GHH did produce the TÜV report very shortly before the commencement of the arbitration proceedings. But arbitration proceedings "need not follow all the 'niceties' of the federal courts; [they] need provide only a fundamentally fair hearing."[11]

---

[11] The appellants rely on this language from Grovner as an independent ground for their argument that the arbitral award should not be enforced: they argue that, because the TÜV report was admitted into the arbitral proceedings on such short notice, and because Hansen's testimony was admitted, the proceedings were fundamentally unfair, and the awards arising from that proceeding should be vacated. As a threshold matter, we note that this argument assumes that a defense against enforcement of an international arbitral award is available on the ground that the arbitral proceeding is "fundamentally unfair." This is an open question. See infra part I.C (discussing exclusivity of the New York Convention's enumeration of defenses against enforcement). We need not decide this question, however, because it is apparent that the admission of Hansen's testimony and the relatively late provision of the TÜV report did not render the proceedings fundamentally unfair. The appellants had ample opportunity to rebut the report and Hansen's testimony, and in fact did so with expert witnesses of their own. Any undue prejudice caused by the admission of Hansen's testimony and of the TÜV report was therefore cured sufficiently to ensure that the proceedings were not rendered fundamentally unfair by the admission of these materials.

Grovner v. Georgia-Pacific, 625 F.2d 1289, 1290 (5th Cir. Unit B 1980).[12]  "An arbitrator enjoys wide latitude in conducting an arbitration hearing.  Arbitration proceedings are not constrained by formal rules of procedure or evidence."  Robbins v. Day, 954 F.2d 679, 685 (11th Cir. 1992), overruled on other grounds, Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985. Arbitration rules, such as those of the AAA, are intentionally written loosely, in order to allow arbitrators to resolve disputes without the many procedural requirements of litigation.

The AAA's Rule 3 is a prime example.  It does not require parties to provide all documents by any certain deadline; rather, it notes the importance of predictability in the proceedings and of the efficient exchange of relevant information, and provides only that "the AAA will make arrangements for the exchange of documentary evidence."  There is thus no notice requirement in Rule 3 that MAN GHH could have violated; instead, arbitrators are left wide discretion to require the exchange of evidence, and to admit or exclude evidence, how and when they see fit.  This is the rule to which the parties agreed, and we therefore cannot say that the relatively late provision of the TÜV report, and its admission by the panel, constituted a failure of the panel to

_____

[12]  In Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

20

adhere to the parties' agreement.[13]

B.

The appellants also argue that the award should be vacated on the ground that the arbitration panel improperly heard testimony from Hansen, a piping expert who was retained by appellant IRI to inspect the tail gas expander casing onsite at the Tampa plant after the first wreck and who was directly involved in the redesign of the expander casing before the second wreck.  The arbitration panel called Hansen to testify <u>sua sponte</u>, after the appellants objected to MAN GHH's attempt to call him.

The appellants assert that "[f]ederal and Florida cases uniformly prohibit 'side-switching,'" that is, testimony against a party's interest by an expert witness formerly retained by that

---

[13]  Respondents also argue that the admission of the TÜV report at a relatively late date violated the panel's own prehearing order.  That order provided that

> [e]ach side shall submit its expert witnesses' reports, witness depositions, or excerpts, to be relied upon, and expert witness summaries/affidavits, which shall include the experts' backgrounds and history, in quadruplicate, to the Association, for transmittal to the Arbitrators, by June 12, 1992.

The admission of such documents after June 12, 1992, in contravention of the panel's order, might or might not violate the agreement of the parties.  We need not reach that question, however, because the TÜV report was an exhibit, not an "expert witness[]' report[], witness deposition[] . . . excerpt[] . . . expert witness summar[y,] [or] affidavit[]."  Its production was therefore not required by the prehearing order, and that order was not violated by its late production.

21

party.[14]  Such testimony, they argue, violates "the well-established public policy protecting . . . fundamental principles of fairness and professional conduct."  The appellants cite no rule of procedure or of evidence, and not a single case, establishing the purported "rule against side-switching."  Rather, the appellants cite cases prohibiting attorneys from, or disqualifying attorneys for, contacting counterparties' experts in violation of: 1) Fed. R. Civ. P. 26,[15] see Durflinger v. Artiles, 727 F.2d 888 (10th Cir. 1984); 2) attorney-client privilege, see Rentclub, Inc. v. Transamerica Rental Fin. Corp.,

---

[14]  As an initial matter, we doubt whether Hansen was in fact an "expert witness" for IRI, and not merely a professional consultant who in this case happened to be a fact witness. Hansen never had an exclusivity or confidentiality agreement with IRI and was never asked to serve as an expert witness in the litigation in district court.  These facts alone suffice to distinguish the instant case from the Middle District of Florida's holding in Rentclub, Inc. v. Transamerica Rental Fin. Corp., 811 F.Supp. 651 (M.D. Fla. 1992), upon which the appellants rely.  Most important, however, Hansen directly observed the redesign and reconstruction of the expander after the first wreck, and consulted with the parties during that process; in this regard his status in the arbitration proceeding was much the same as that of a consulting physician in a medical malpractice case.  Nevertheless, we assume arguendo that Hansen's consulting work for IRI qualifies him as IRI's "expert witness" for purposes of this discussion.

[15]  Rule 26(b)(4)(B) provides:

A party may, through interrogatories or by deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

22

811 F.Supp. 651 (M.D. Fla. 1992); or 3) the confidentiality of work product or litigation strategy, see MMR/Wallace Power & Indus., Inc. v. Thames Assocs., 764 F.Supp. 712 (D. Conn. 1991); Geralnes B.V. v. City of Greenwood Village, 609 F.Supp. 191 (D. Colo. 1985).  The effect of these rules, taken together, is that parties will rarely be able to avail themselves of the services of the other side's expert witnesses--but that is merely the effect of these rules and not a rule unto itself.  In the absence of any precedent, we decline to recognize any blanket rule or policy against "side-switching."

Moreover, none of the concerns in the cases cited by respondents are implicated by the arbitration panel's admission of Hansen's testimony.  Rule 26 does not independently apply to arbitration proceedings, and attorney-client privilege is not a concern because there is no allegation that Hansen divulged any information properly protected by the privilege.  Concerns about the confidentiality of work product and litigation strategy are not implicated because Hansen was called by the panel, not by MAN GHH, and because his testimony before the panel neither relied upon any confidential work product of IRI's attorneys nor included any information about the respondents' litigation strategy.

Finally, even if such concerns were implicated by the admission of Hansen's testimony, we could not consider vacatur of the district court's order confirming the award unless that admission fell within one of the New York Convention's seven

23

grounds for refusal to enforce an award.  See <u>M & C Corp. v.</u>
<u>Erwin Behr GmbH & Co., KG</u>, 87 F.3d 844, 851 (6th Cir. 1996)
("[T]he Convention lists the exclusive grounds justifying refusal
to recognize an [international] arbitral award.").  Even if the
purported "rule against side-switching" did exist, for instance,
it would not control arbitration proceedings unless the parties
agreed to be controlled by it. <u>See</u> <u>Szuts v. Dean Witter Reynolds</u>,
<u>Inc.</u>, 931 F.2d 830, 831 (11th Cir. 1991) (noting that power and
authority of arbitrator at arbitration proceeding is dependent
upon the provisions of the arbitration agreement under which he
was appointed).  Nor have the appellants established that the
admission of Hansen's testimony was a violation of public policy
of the sort required to sustain a defense under article V(b)(2)
of the New York Convention.  We have held that domestic arbitral
awards are unenforceable on grounds that they are violative of
public policy only when the award violates some "explicit public
policy" that is "well-defined and dominant. . . [and is]
ascertained 'by reference to the laws and legal precedents and
not from general consideration of supposed public interests.'"
<u>Drummond Coal Co. v. United Mine Workers, District 20</u>, 748 F.2d
1495, 1499 (11th Cir. 1984) (quoting <u>W.R. Grace & Co. v. Local</u>
<u>Union 759, Int'l Union of the United Rubber, Cork, Linoleum &</u>
<u>Plastic Workers</u>, 461 U.S. 757, 766, 103 S.Ct. 217 2183, 2183, 76
L.Ed.2d 298 (1983)).  We believe that rule applies with equal
force in the context of international arbitral awards.  <u>See</u>
<u>Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de</u>

24

l'Industrie du Papier (RAKTA), 508 F.2d 969, 974 (2d Cir. 1974) (holding that "the Convention's public policy defense should be construed narrowly"). The appellants cite no laws or precedents in support of their invocation of "the well-established public policy protecting. . . fundamental principles of fairness and professional conduct." We therefore hold that the appellants have not established a violation of public policy sufficiently to sustain a defense under article V(b)(2) of the New York Convention.

C.

Finally, the appellants also argue that the arbitral award should be vacated on the ground that it is "arbitrary and capricious." See, e.g., Ainsworth v. Skurnick, 960 F.2d 939, 941 (11th Cir.1992), cert. denied, 507 U.S. 915, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993). We reject this argument as well. Under the law of this circuit, domestic arbitral awards may be vacated for six different reasons; four are enumerated by the FAA and two are non-statutory defenses against enforcement, derived by the courts from the statutory list. See Raiford v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 1410, 1412 (11th Cir. 1990). The two non-statutory defenses against enforcement of a domestic award are 1) that the award is "arbitrary and capricious"[16] and

---

[16] A domestic arbitral award may be vacated as "arbitrary and capricious" if it "exhibits a wholesale departure from the law [or] if the reasoning is so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling."

25

2) that enforcement of the award would be contrary to public policy.  See Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456, 1458 (11th Cir. 1997).

As discussed supra, the seven defenses against enforcement of an international arbitral award that are enumerated in the New York Convention include a public policy defense.  The Convention does not, however, include a defense against enforcement of an award on the ground that the award is "arbitrary and capricious."  The omission is decisive.  Section 207 of Chapter 2 of the FAA explicitly requires that a federal court "shall confirm [an international arbitral] award unless it finds one of the grounds for refusal or deferral of . . . enforcement of the award specified in the [New York] Convention."  9 U.S.C. § 207 (1997 supp.).  The Convention itself provides that "enforcement of [an] award may be refused, at the request of the party against whom it is invoked, only if that party furnishes . . . proof that" one of the enumerated defenses is applicable.  Convention on the Recognition and Enforcement of Foreign Arbitral Awards, opened for signature June 10, 1958, 21 U.S.T. 2517, 2520, T.I.A.S. No. 6997, 330 U.N.T.S. 3 (reprinted in 9 U.S.C.A. § 201 note (West supp. 1997)) (emphasis added).  In short, the Convention's enumeration of defenses is exclusive.  See Yusuf Ahmed Alghanim & Sons, 126 F.3d at 20 (holding that "the grounds for relief enumerated in Article V of the Convention are the only grounds

_____

Brown v. Rauscher Pierce Refsnes, Inc., 994 F.2d 775, 781 (11th Cir. 1993).

26

available for setting aside an arbitral award"); M & C Corp. v. Erwin Behr, 87 F.3d 844, 851 (6th Cir. 1996) (same). We therefore hold that no defense against enforcement of an international arbitral award under Chapter 2 of the FAA is available on the ground that the award is "arbitrary and capricious," or on any other grounds not specified by the Convention. The appellants' attempt to invoke such a defense thus fails.

We therefore decline to vacate the arbitral award granted to MAN GHH by the Tampa panel. Because we affirm the award, we also decline to vacate the derivative awards of costs and conversion rate compensation.

## II.

On cross-appeal, MAN GHH complains of the district court's refusal to award to MAN GHH post-arbitral-award, prejudgment interest. MAN GHH moved the court to enter judgment on the arbitral award and to grant prejudgment interest from the date the last arbitral award was made through the date of the Court's entry of the amended final judgment. The court entered judgment on the award but declined to award such interest. The court held that its jurisdiction was grounded in diversity, and that state law therefore would control the award of prejudgment interest. The court then concluded that Florida law does not authorize the granting of post-arbitral-award, prejudgment interest. Because we hold that the district court held federal question

27

jurisdiction over the case pursuant to Chapter 2 of the FAA, see part I, supra, and that federal law allows awards of post-arbitral-award, prejudgment interest, we remand for a determination whether, in the court's discretion, the circumstances of the instant case warrant such an award.

Unlike most other countries, the United States has no federal statute governing awards of prejudgment interest on international arbitral awards. See John Y. Gotanda, "Awarding Interest in International Arbitration," 90 Am. J. Int'l L. 40, 45 (1996). Instead, awards of prejudgment interest are equitable remedies, to be awarded or not awarded in the district court's sound discretion. See Osterneck v. E.T. Barwick Ind., Inc., 825 F.2d 1521, 1536 (11th Cir. 1987); Waterside Ocean Navigation Co. v. International Navigation Ltd., 737 F.2d 150, 153 (2d Cir. 1984). Under the law of this circuit, "[p]re-judgment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his," see Insurance Co. of N. Am. v. M/V Ocean Lynx, 901 F.2d 934, 942 (11th Cir. 1990), and absent any reason to the contrary, it should normally be awarded when damages have been liquidated by an international arbitral award. See Waterside Ocean Navigation, 737 F.2d at 153-54 ("Absent persuasive reasons to the contrary, we do not see why pre-judgment interest should not be available in actions brought under the [New York] Convention."); see also Fort Hill Builders, Inc. v. National Grange Mut. Ins. Co., 866 F.2d 11, 14 (1st Cir. 1989) (holding that, under either federal or Rhode Island law,

28

post-award, prejudgment interest should be awarded on domestic arbitral award); Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59 (3d Cir. 1986) (holding that confirmed domestic arbitral award bears interest from date of award, not from date of judgment confirming award).[17]

In the absence of a controlling statute, federal courts' choice of a rate at which to determine the amount of prejudgment interest to be awarded is also a matter for their discretion. That choice is usually guided by principles of reasonableness and fairness, by relevant state law, and by the relevant fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in awarding post-judgment interest. See 28 U.S.C. § 1961; Gotanda, supra, at 45 and n. 63 (citing cases).

Because the district court below held federal subject-matter jurisdiction under 9 U.S.C. § 203, the decision whether to grant prejudgment interest was a matter for the court's discretion and was not controlled by state law. The district court declined to award post-arbitral-award, prejudgment interest on the grounds that it held only diversity jurisdiction, that state law therefore controlled, and that Florida law prohibited such an award under the circumstances. Because we hold that federal law controls both the entitlement to and the rate of post-arbitral-

---

[17] We note that international arbitrators often award post-arbitral-award interest. See, e.g., Bergesen v. Joseph Muller Corp., 548 F.Supp. 650, 651 (S.D. N.Y. 1982); Laminoirs-Trefileries-Cableries de Lens, S.A. v. Southwire Co., 484 F.Supp. 1063, 1069 (N.D. Ga. 1980).

award, prejudgment interest, we find that the district court failed to exercise its discretion.[18]  We therefore remand for a determination whether, under the circumstances, MAN GHH is entitled to post-arbitral-award, prejudgment interest.

### III.

In a separate appeal, MAN GHH's counsel challenge the district court's imposition of Rule 11 sanctions.[19]  The decision

---

[18]  We also note that, while the district court may choose to be guided by Florida law in determining whether to grant post-award, prejudgment interest, it appears to have misread Pharmacy Management Servs., Inc. v. Perchon, 622 So.2d 75 (Fla. 2d Dist. Ct. App. 1993).  That case held that a court may not grant pre-award interest on a final arbitral award that states that it is in full settlement of all claims.  Perchon did not hold that a court may not grant post-award, pre-judgment interest on such an award.

[19]  Rule 11 provides in relevant part:

  (b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances--

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

whether to impose Rule 11 sanctions is left to the district court's sound discretion.  See Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996).  An abuse of discretion occurs when the court makes a clear error of law or fact in determining whether to impose sanctions.  See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990).

Sanctions may be imposed under Rule 11 for filings that are presented to the court "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."  Fed. R. Civ. P. 11(b)(1); see also Pelletier v. Zwiefel, 921 F.2d 1465, 1514 (11th Cir. 1991).  "Improper purpose may be shown by excessive persistence in pursuing a claim or defense in the face of repeated adverse rulings . . . .  Rule 11 is intended to reduce frivolous claims and to deter costly meritless maneuvers, thereby eliminating delay, and reducing the cost of litigation."  Pierce v. Commercial Warehouse, 142 F.R.D. 687, 690-91 (M.D. Fla. 1992).

---

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

Fed. R. Civ. P. 11.

31

In order for sanctions to be appropriate, however, the filing for which sanctions are imposed must be frivolous, that is, it must enjoy no factual and legal support in the record. See Davis v. Carl, 906 F.2d 533, 538 (11th Cir. 1990) ("Rule 11 is intended to deter claims with no factual or legal basis at all; creative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment." (emphasis in original)). In order for sanctions to be imposed for excessive relitigation of an issue already decided by the court, the disputed issue must have been clearly decided by the court's earlier orders, and counsel's relitigation of the issue must clearly offer no meritorious new arguments. See, e.g., Mariani v. Doctors Assoc's, Inc., 983 F.2d 5, 8 (1st Cir. 1993) (imposing sanctions for "virtually verbatim" reargumentation of an issue--dismissal of the action--clearly already decided by the court) (emphasis in original).

The facts underlying the instant sanctions order are as follows. MAN GHH provided the expander and various services to Barnard and Burk pursuant to one contract for the design, manufacture, and sale of the expander ("the design contract") and one service contract; MAN GHH also provided spare parts and services to Nitram under two separate service contracts.[20] The

---

[20] Specifically, MAN GHH 1) provided the expander to Barnard and Burk Group under the design contract; 2) provided engineering services to Barnard and Burk Engineers and Constructors under a second contract; 3) provided engineering services to Nitram under a third contract; and 3) provided a spare rotor to Nitram under a fourth contract. We refer to these latter three contracts as

32

transactions between MAN GHH, Nitram, and Barnard and Burk that were the subject of the arbitral proceeding thus arose out of four separate contracts. In the district court, MAN GHH first moved for arbitration of the third-party claims asserted against it by Barnard and Burk, and later, after Nitram and IRI had filed tort and breach-of-warranty claims against MAN GHH, moved for arbitration of those claims as well.[21] At the time that MAN GHH moved for arbitration of Nitram's and IRI's claims against it, only one contract--the design contract--had been entered into the record below. Nitram and IRI were not parties to this contract and argued that they therefore ought not to be ordered to submit their claims to the arbitrators. MAN GHH contended--and the district court concluded--that all of the claims involved in the case at that time were so closely related that they all should be submitted to the Tampa panel. The district court referred to the arbitration clause in the design contract and ordered arbitration, in Tampa, of Nitram's and IRI's claims against MAN

---

"the service contracts" for brevity's sake.

[21] As the district court noted, Nitram's and IRI's claims against MAN GHH were arbitrable even though they were cast as tort and breach-of-warranty claims, rather than contract claims. See Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 846 (2d Cir. 1987) (holding that, in determining whether particular claim falls within scope of arbitration agreement, court focuses on factual allegations in complaint rather than legal causes of action asserted, and if allegations underlying claims "touch matters" covered by parties' arbitration agreement, then claims must be arbitrated, whatever legal labels are attached to them).

33

GHH, along with those of Barnard and Burk.[22]

Before the Tampa arbitration began, MAN GHH returned to the district court and moved for 1) a preliminary injunction limiting the scope of the Tampa arbitration and, in the alternative, 2) an order compelling arbitration, in Europe, of some claims that Nitram and Barnard and Burk intended to raise in the Tampa arbitral proceeding.[23] MAN GHH argued that Barnard and Burk and Nitram were raising new contract claims before the Tampa panel, claims arising from the three service contracts not referred to by the district court in its earlier orders compelling arbitration. These new claims, MAN GHH argued, were due to be arbitrated in Paris and Zurich pursuant to arbitration clauses in the service contracts. Barnard and Burk and Nitram contended that they had made clear to the court that claims under those contracts might well arise during the arbitral proceedings, and

---

[22] In 1990, while the arbitral proceedings were still pending, the district judge who had presided over the case, the Hon. George C. Carr, passed away. All subsequent district court proceedings referred to in this opinion were presided over by the Hon. Elizabeth A. Kovachevich.

[23] This motion was legally proper; the district court had the power to enjoin the arbitration of the newly-asserted contract claims. See Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 985 F.2d 1067, 1068-69 (11th Cir. 1993) (holding that federal courts have power to enjoin arbitration of state common law claims in cases in federal court); see also Societe Generale de Surveillance, S.A. v. Raytheon European Management and Sys. Co., 643 F.2d 863, 868 (1st Cir. 1981) ("To allow a federal court to enjoin an arbitration proceeding which is not called for by the contract interferes with neither the letter nor the spirit of this law. Rather, to enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present.") (emphasis in original).

34

that the court, in anticipation, included those potential claims in its orders compelling arbitration in Tampa.  The district court agreed, and held that its earlier orders compelling arbitration had considered the venue of claims arising under the three service contracts and had mandated that arbitration of those claims proceed in Tampa.[24]  The court therefore denied the preliminary injunction.

Barnard and Burk then moved for sanctions pursuant to Rule 11, arguing that MAN GHH's motion for preliminary injunction constituted an improper attempt to relitigate an issue--the venue of the arbitral proceeding--already decided by the court.  The court agreed, and awarded sanctions.  See Nitram, Inc. v. Industrial Risk Insurers, 149 F.R.D. 662 (M.D. Fla. 1993).  Enforcement of the sanctions order was stayed pending this appeal.

MAN GHH's counsel now argue that the district court clearly erred in holding that there was no support in the record for MAN GHH's assertion that the claims asserted by Nitram and Barnard

---

[24]  The district court's order denying the preliminary injunction merely stated that a preliminary injunction would be "inappropriate" under the facts of the case; it also incorporated by reference, however, the opposition to the motion for preliminary injunction filed by Nitram, IRI, and Barnard and Burk.  That opposition argued that the earlier order compelling arbitration of Nitram's and IRI's claims against MAN GHH included the claims arising under the three service contracts.  In its later order imposing sanctions, the district court specifically verified its intention to incorporate that particular argument into the court's denial of the motion for preliminary injunction. We note in this context that the judge who reviewed the earlier orders compelling arbitration and, we believe, misread them, was not the same judge who entered those orders.  See supra note 22.

and Burk under the three service contracts were not covered by the district court's earlier orders compelling arbitration, and that those claims were due to be arbitrated in Europe. Thus, counsel argue, the district court abused its discretion, and the sanctions order should be vacated. We agree.

The initial suit brought by Nitram against IRI and Barnard and Burk was a suit in contract, based on the contract between Nitram and Barnard and Burk for the installation of the expander. Barnard and Burk's third-party complaint against MAN GHH sought indemnification on the basis of the design contract between MAN GHH and Barnard and Burk. Furthermore, the court's order compelling arbitration of Barnard and Burk's third-party claims against MAN GHH was wholly pursuant to the design contract; the order compelling arbitration of those claims mentioned and cited only the arbitration clause contained in the design contract. Indeed, the three service contracts had never even been entered into the record at the time that the court entered its orders compelling arbitration. When the court later ordered arbitration of Nitram's and IRI's tort and breach-of-warranty claims against MAN GHH, it did so on the ground that those claims were intertwined with and grounded in the design contract between MAN GHH and Barnard and Burk, and on the ground that Nitram and IRI were third-party beneficiaries of that contract. In short, the district court's orders compelling arbitration committed to arbitration only the arbitrable claims that were before the court at the time: Barnard and Burk's third-party claims against MAN

36

GHH and the tort and breach-of-warranty claims brought by Nitram and IRI against MAN GHH.

The court could not have done more. There had been no contract claims brought on the three service contracts; there were thus no arbitration clauses before the court mandating arbitration of any such claims, and the court therefore had no jurisdiction to compel arbitration of those claims. Chapter 2 of the FAA, like Chapter 1, "does not require parties to arbitrate when they have not agreed to do so, . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement." Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989) (citations omitted). "It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." Id. Like other contracts, an agreement to arbitrate disputes may not be enforced by the courts until the agreement has been brought before the court by a proper pleading. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 1806 n. 12, 18 L.Ed.2d 1270 (1967) (stating that the FAA was designed "to make arbitration agreements as enforceable as other contracts, but not more so"). In the instant case, the parties had placed contract claims arising from the three service contracts under

the purview of the arbitration clauses in those contracts[25]--not under the arbitration clause in the design contract--and no contract claims arising from the service contracts had been pled to the district court. The court therefore could not have ordered arbitration of those claims.[26]

Therefore, when the arbitrators agreed to hear claims arising out of the three collateral service contracts, they did so outside of their charge by the district court.[27] Consequently, MAN GHH's counsel's motion for a preliminary injunction limiting the scope of the Tampa arbitration and for an order moving arbitration of these claims to Europe clearly enjoyed support in the record. The district court's determination that the motion did not enjoy any such support was

---

[25] Specifically, claims arising under MAN GHH's contract with Barnard and Burk Engineers and Constructors (see supra note 20) were due to be arbitrated in Zurich, and claims arising under MAN GHH's spare rotor contract with Nitram were due to be arbitrated in Paris. MAN GHH's contract with Nitram for engineering services contained no arbitration clause, and the district court therefore very likely could not properly have compelled arbitration of claims arising thereunder at all. Consequently, it certainly may not be said that claims arising under these contracts were clearly due to be arbitrated in Tampa.

[26] As noted supra, we conclude that the court's orders compelling arbitration did not purport to commit to arbitration any contract claims arising out of the three service contracts.

[27] It also seems that they did so outside of the agreement of the parties to the arbitration, since MAN GHH did not agree to have those claims arbitrated in Tampa. As noted supra, however, MAN GHH prevailed on those claims at arbitration and therefore did not make this argument to the district court, and does not make this argument on appeal. The appellants do not attempt to make this argument either. We therefore deem the argument waived.

therefore clearly erroneous, and its imposition of sanctions was an abuse of discretion.  Accordingly, we reverse the order imposing Rule 11 sanctions upon MAN GHH's counsel.

CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the motion to vacate the arbitral award, but VACATE the district court's denial of prejudgment interest and REMAND the case for resolution of that issue. We also REVERSE the district court's imposition of Rule 11 sanctions against MAN GHH's counsel.  SO ORDERED.