Affirmed; Opinion of August 27, 2002 Withdrawn; and Opinion on Rehearing
and Concurring and Dissenting Opinions on Rehearing f









 




 
 
 
  
 
 
 






Affirmed; Opinion of August 27, 2002 Withdrawn; and
Opinion on Rehearing and Concurring and Dissenting Opinions on Rehearing filed
April 24, 2003.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-00-00765-CV

____________

 

TANOX, INC. f/k/a TANOX BIOSYSTEMS,
INC., Appellant

 

V.

 

AKIN, GUMP, STRAUSS, HAUER &
FELD, L.L.P., ROBINSON LAW FIRM, WILLIAMS, BIRNBERG & ANDERSEN, L.L.P.,
MICHAEL J. MADIGAN, MICHAEL J. MUELLER, KENNETH M. ROBINSON, and

GERALD M. BIRNBERG, Appellees

 



 

On Appeal from the 11th District Court

Harris County, Texas

Trial Court Cause No. 97-55960

 



 

O P I N I O N   O
N   R E H E A R I N G








Tanox, Inc. f/k/a Tanox Biosystems, Inc., appeals the trial
court=s confirmation of an arbitration
award in favor of Akin, Gump, Strauss, Hauer & Feld, L.L.P., The Robinson
Law Firm, and Williams, Birnberg & Andersen, L.L.P., and the summary
judgment entered in favor of Michael J. Madigan, Michael J. Mueller, Kenneth M.
Robinson, and Gerald M. Birnberg.  On
original submission we affirmed in part, and reversed and remanded in
part.  On rehearing, the panel has withdrawn
our previous opinion of August 27, 2002, and substitutes the following opinion
on rehearing in which we have affirmed the judgment of the trial court.  

                                                             I. 
Background

Tanox envisaged the use of an antibody called Aanti-IgE@ in the treatment of asthma and
allergies.  To develop the antibody,
Tanox needed a partner.  Tanox,
accordingly, entered into a confidentiality agreement with Genentech, Inc. in
1989, for the development of the antibody. 
Genentech subsequently decided not to work with Tanox.  Therefore, in 1990, Tanox entered into an
agreement with Ciba-Geigy, Ltd., under which Ciba-Geigy agreed to pay Tanox
royalties on the sale of the product.  

In December 1993, Tanox filed a trade secret lawsuit in
federal district court against Genentech alleging that Genentech had violated
the confidentiality agreement and utilized Tanox=s biotechnology to develop its own
allergy drug.  In January 1994, Genentech
filed a separate lawsuit against Tanox, asserting a claim for patent
infringement.  Genentech added Ciba-Geigy
as a defendant in its patent infringement lawsuit, and the two lawsuits were
consolidated.  








Tanox had originally hired Ed Harrell of Hughes, Watters
& Askanase to represent it in the trade secret lawsuit on an hourly rate
basis.  Tanox, however, was not able to
continue paying Harrell and his law firm on an hourly rate and, accordingly,
sought counsel to represent it on a contingency fee basis with respect to its
trade secret claim against Genentech. 
After considering a number of attorneys, Tanox ultimately hired Gerald
Birnberg of Williams, Birnberg & Andersen, Kenneth Robinson of The Robinson
Law Firm, and Michael Madigan and Michael Mueller of Akin, Gump, Strauss, Hauer
& Feld (collectively, “the Lawyers”) on a contingency fee basis.  On August 1, 1994, Tanox entered into a
contingency fee agreement with the Lawyers for representation of its trade
secrets claim.[1]


Under the fee agreement, Tanox agreed to pay the Lawyers a
contingency fee pursuant to a sliding scale: 
25% of the first $32 million recovered by Tanox, 33a% of recovery from $32 million to $60
million, 40% of recovery from $60 million to $200 million, and 25% of recovery
over $200 million.  In the event the case
was settled before, during, or after trial, Tanox agreed the first $8 million
received from Genentech would be paid to the Lawyers, “regardless of whether
the total recovery amounts to or is less than $32 million.” 

The fee agreement further provided the Lawyers would, in the
event of a settlement, recover fees in the form of a “new business arrangement.”  Specifically, the Lawyers would be paid on “[a]ny cash, money, or substantial equivalent, any tangible
property, and any future payments (such as licensing fees, royalties, income
from third parties with respect to defendants= intellectual property, and similar
future payments) received by Tanox as a result of the litigation, on account of
such new business arrangement, . . .” 
The Lawyers= share of royalties from a new business arrangement achieved
as a result of the litigation was 10%.

Tanox also agreed to pay the Lawyers $100 million if they
obtained a permanent injunction barring Genentech from entering the marketplace
with a product competitive with an allergy product developed by Tanox.  The total fees Tanox agreed to pay the
Lawyers were capped at $500 million and the total fees derived from royalties
were capped at $300 million.








On January 30, 1996, Tanox and Genentech agreed to a
settlement, which included a $16 million cash payment to Tanox by Genentech and
a new business arrangement among Tanox, Genentech, and Ciba-Geigy for the
development of the allergy drug.  The new
business arrangement provided for (1) the release of Genentech=s patent infringement claims against
Tanox, (2) the release of Tanox=s unasserted patent infringement claims against Genentech,
(3) the cross-licensing of patent rights, and (4) Tanox=s receipt of royalties from Genentech
and Ciba-Geigy.  Furthermore, Ciba-Geigy
and Genentech agreed to combine their efforts in certain markets, which
Ciba-Geigy held exclusively under its 1990 agreement with Tanox.  

On July 8, 1996, the parties signed the settlement
agreement.  Although the fee agreement
provides Tanox would “not obtain any settlement nor receive any funds relating
to this matter without first consulting with and making full disclosure to the
successor attorneys,” Genentech transferred $16 million to Tanox directly on
July 12, 1996.  Tanox did not inform the
Lawyers of the $16 million wire transfer. 
On July 15, one of the Lawyers, Michael Madigan, learned of the $16
million wire transfer from Genentech=s counsel.  

When confronted about the receipt of the $16 million, David
Anderson, Tanox=s executive vice president, chief operating officer, and
in-house counsel, first claimed he did not know whether Tanox had received the
$16 million payment, and then would not confirm whether the money was in the
country.  The Lawyers demanded immediate
payment of $8 million from Tanox.  Tanox
offered to pay the Lawyers $7 million, less expenses, if they would give up their
rights under the fee agreement to royalties received by Tanox.  








On July 16, 1996, the Lawyers filed a motion to intervene
under seal in federal court seeking to recover its fees.  Tanox objected to the motion to intervene
and, alternatively, moved to compel arbitration of the fee dispute under the
arbitration clause in the fee agreement. 
The Lawyers and Tanox entered into an agreement under which (1) Tanox
agreed to wire $6,724,795.15 on July 29, 1996, to an escrow account in the name
of Hughes, Watters & Askanase, which in turn would transfer the money to
Akin, Gump when the motion to dismiss the litigation had been filed with the
court; (2) Tanox and the Lawyers agreed to submit their dispute over the fees
to arbitration; and (3) the Lawyers agreed to withdraw their motion to
intervene on July 26, 1996.  

The fee dispute proceeded to arbitration before a panel of
three arbitrators.  On September 29,
1999, the arbitrators issued their award in favor of the Lawyers.  The arbitrators found Tanox breached the fee
agreement by failing to pay the Lawyers the first $8 million received from
Genentech and Tanox anticipatorily breached the fee agreement by repudiating
its obligation to pay a percentage contingent fee on royalty payments received
by Tanox pursuant to the new business arrangement.[2]  The arbitrators found against Tanox on its
claims for breach of contract and its tort claims, including breach of
fiduciary duty, legal malpractice, and fraud. 


The Lawyers moved to confirm the arbitration award and Tanox
filed an application to vacate the arbitration award.  On February 16, 2000, the trial court entered
an amended interlocutory judgment granting the motion and application to
confirm the arbitration award, denying the motion to vacate the award, and
ordering that Tanox take nothing on its claims against the Lawyers.  

Asserting the arbitration award precluded Tanox=s claims against them, the Individual
Lawyers moved for summary judgment on the affirmative defenses of res judicata
and collateral estoppel on all of Tanox=s claims.  On March 28, 2000, the trial court granted
summary judgment in favor of the Individual Lawyers and entered a final
judgment, from which Tanox brings this appeal.








                                                                              




II. 
Standard of Review

Although the parties agree the
Federal Arbitration Act (“FAA”)[3]
applies to this case, they dispute the judicial standard of review that should
be applied to the arbitration award. 
Ordinarily, the court of appeals reviews the trial court=s decision to confirm an arbitration
award de novo under the FAA.  Gateway
Techs., Inc. v. MCI Telecomms. Corp., 64 F.3d 993, 996 (5th Cir.
1995).  The review of an arbitration
award, however, is usually “extraordinarily narrow.”  Hughes Training, Inc. v. Cook, 254
F.3d 588, 593 (5th Cir. 2001), cert. denied, 534 U.S. 1172 (2002).  The court may not review the arbitrators= decision on the merits even if it is
alleged that the decision is based on factual error or it misinterprets the
parties= agreement.  Major League Baseball Players Ass=n v. Garvey, 532 U.S. 504, 509 (2001); United
Paperworkers Int=l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987).  It is presumed under the FAA that arbitration
awards will be confirmed.  Dawahare v.
Spencer, 210 F.3d 666, 669 (6th Cir.), cert. denied, 531 U.S. 878
(2000).  Therefore, A>[d]isputes that are committed by
contract to the arbitral process almost always are won or lost before the
arbitrator.  Successful court challenges
are few and far between.=@ 
Gupta v. Cisco Sys., Inc., 274 F.3d 1, 3 (1st Cir. 2001) (quoting
Keebler Co. v. Truck Drivers, Local 170, 247 F.3d 8, 10 (1st Cir.
2001)).  








Although acknowledging the FAA defines the standard of review
for vacatur of arbitration awards, Tanox argues the parties contractually
agreed to expand the scope of review beyond that provided by the FAA.  The parties may agree to expand judicial
review of an arbitration award beyond the scope of the FAA.  Hughes Training, Inc., 254 F.3d at
593.[4]  Tanox and the lawyers agreed to submit their
disputes to arbitration “under the rules of the American Arbitration
Association then in place and applicable legal and equitable principles.”  The fee agreement further includes a choice
of law provision stating the “agreement shall be construed in accordance with
the laws of the State of Texas.”  Tanox
contends these provisions reflect the parties= intent that the arbitrators= award should be judicially reviewed
under “the normal appellate standard of review.”

Other courts have addressed this issue.  The Ninth Circuit Court of Appeals considered
an arbitration provision in which the parties agreed “‘[t]he decisions and
awards of the Tribunal may be enforced by the judgment of the Court or may be
vacated, modified or corrected by the Court (a) based upon any grounds referred
to in the Act, or (b) where the Tribunal=s findings of fact are not
supported by substantial evidence, or (c) where the Tribunal=s conclusions of law are erroneous.’”
 Lapine Tech. Corp. v. Kyocera Corp.,
130 F.3d 884, 887 (9th Cir. 1997) (emphasis added).  Finding the parties had contracted for
heightened judicial scrutiny of the arbitrators= award when they agreed to review of
errors of fact or law, the court held it could not disregard the parties= agreement by limiting its review to
the grounds for vacatur set forth in the FAA. 
Id. at 888.  

The Fifth Circuit Court of Appeals has twice addressed this
issue.  In Gateway, the parties
agreed “‘[t]he arbitration decision shall be final and binding on both parties,
except that errors of law shall be subject to appeal.’”  Gateway Techs., Inc., 64 F.3d at 996
(emphasis in original).  The Fifth
Circuit held the parties had contractually agreed to expand judicial review and
their contractual provision supplemented the FAA=s default standard for review by
allowing for de novo review of issues of law embodied in the arbitration
award.  Id. at 997.  More recently in Hughes Training, the
Fifth Circuit found the judicial scope of review was expanded by the
arbitration agreement, which provided that “‘in actions seeking to vacate an
award, the standard of review to be applied to the arbitrator=s findings of fact and conclusions of
law will be the same as that applied by an appellate court reviewing a decision
of a trial court sitting without a jury.’”  Hughes
Training, Inc., 254 F.3d at 590 (emphasis added).








The arbitration provision of the fee agreement between the
Lawyers and Tanox lacks the clear and express language altering the standard of
review found in Lapine, Gateway, and Hughes Training.  Therefore, we conclude the parties did not
intend to alter the standard of review provided by the FAA.  See UHC Management Co., 148 F.3d at
998 (stating parties= intent to expanded judicial review of arbitration award must
be clearly and unmistakably expressed).  

Relying on the Texas choice of law provision, Tanox further
argues the arbitrators and reviewing court have no authority to disregard Texas
law.  However, even with the inclusion of
a choice of law provision, in the absence of an express provision that is
intended to modify the scope of judicial review of an arbitration award, the
FAA=s default standard is the applicable
standard of review in this case.  See
Roadway Package Sys., Inc. v. Kayser, 257 F.3d 287, 294 (3d Cir.), cert.
denied, 534 U.S. 1020 (2001) (declining to construe choice of law clause,
which provided arbitration agreement “shall be governed by and construed in
accordance with the laws of the Commonwealth of Pennsylvania,” as evidencing
clear intent to incorporate Pennsylvania=s standards for judicial review); Mantle
v. Upper Deck Co., 956 F. Supp. 719, 725B26 (N.D. Tex. 1997) (observing that
even though arbitration agreement provided Texas law would govern substantive
disputes in arbitration, agreement contained no express provision, as in Gateway,
that is intended to modify scope of judicial review and, therefore, FAA default
standard was applicable).  

                                                 III. 
Grounds for Vacatur

The
FAA provides four grounds for vacating an arbitration award:

(1) Where the award was procured by corruption, fraud,
or undue means.

(2) Where there was evident partiality or corruption
in the arbitrators, or either of them.








(3) Where the arbitrators were guilty of misconduct in
refusing to postpone the hearing, upon sufficient cause shown, or in refusing
to hear evidence pertinent and material to the controversy; or any other
misbehavior by which the rights of any party have been prejudiced.

(4)
Where the arbitrators exceeded their powers, or so imperfectly executed them
that a mutual, final, and definite award upon the subject matter submitted was
not made.

9 U.S.C. ' 10 (1999).  In addition
to the four statutory grounds, there are several common law grounds for
vacating an arbitration award:  (1) the
arbitrator manifestly disregards the law,[5]
(2) the award is against public policy,[6]
and (3) the award is arbitrary or capricious.[7]  

                                            IV. 
Breach of Fiduciary Duty

                                               A.  Manifest Disregard of the Law








Tanox claims the arbitrators manifestly disregarded the law
in finding the Lawyers did not breach their fiduciary duties.  “Manifest disregard of the law” is a
judicially created ground for vacating arbitration awards.  Merrill Lynch, Pierce, Fenner & Smith,
Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995).  Manifest disregard of the law is more than
mere error or misunderstanding with respect to the law.  LaPrade v. Kidder, Peabody & Co., Inc.,
246 F.3d 702, 706 (D.C. Cir. 2001); Jaros, 70 F.3d at 421; Health
Servs. Mgmt. Corp. v. Hughes, 975 F.2d 1253, 1267 (7th Cir. 1992); Carte
Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int=l, Ltd., 888 F.2d 260, 265 (2d Cir.
1989).  Under this standard, the
arbitrator clearly recognizes the applicable law, but chooses to ignore
it.  Wonderland Greyhound Park, Inc.
v. Autotote Sys., Inc., 274 F.3d 34, 36 (1st Cir. 2001); Missouri River
Servs., Inc. v. Omaha Tribe of Neb., 267 F.3d 848, 855 (8th Cir. 2001), cert.
denied, 535 U.S. 1053 (2002); Brown, 211 F.3d at 1223; Williams
v. Cigna Fin. Advisors, Inc., 197 F.3d 752, 762 (5th Cir. 1999); Jaros,
70 F.3d at 421; Health Servs. Mgmt. Corp., 975 F.2d at 1267.  ATo adopt a less strict standard of
judicial review would be to undermine our well established deference to
arbitration as a favored method of settling disputes when agreed to by the
parties.@ 
Carte Blanche (Singapore) Pte., Ltd., 888 F.2d at 265.  Therefore, the court=s “review for manifest disregard of
the law does not open the door to extensive judicial review.”   Dawahare,
210 F.3d at 669.  Accordingly, judicial
review under this standard is “extremely limited.”  Carte Blanche (Singapore) Pte., Ltd.,
888 F.2d at 265; see also Jaros, 70 F.3d at 421 (stating manifest
disregard of law is a “very narrow standard of review”).  The party seeking to vacate an arbitration
award bears the burden of demonstrating the arbitration panel acted in manifest
disregard of the law.  LaPrade,
246 F.3d at 706; Brown, 211 F.3d at 1223.  

                                          B.  Specific Breaches of Fiduciary Duty

Tanox claims the Lawyers breached
their fiduciary duties in several ways. 
First, Tanox alleges the Lawyers knew the new business arrangement
provision in the fee agreement was ambiguous, but failed to disclose to Tanox
the material ambiguity and further 
failed to disclose their interpretation of that provision and the
conflict of interest that provision created. 
Second, Tanox alleges that during the settlement discussions, the
Lawyers failed to disclose to Tanox that the proposed settlement would give
rise to an “unexpected and massive claim for fees.”  Third, Tanox alleges the Lawyers prepared to
sue and actually sued Tanox while still representing Tanox.  

                          1.  Representation Prior to Entering into Fee
Agreement

Tanox claims the arbitrators= conclusion that the Lawyers did not
owe any fiduciary duties to Tanox prior to the execution of the fee agreement
on August 1, 1994, is in manifest disregard of the law.  The arbitrators found the attorney-client
relationship between the lawyers and Tanox began when the fee agreement was
signed, not before then.[8]  








A fiduciary relationship exists between attorneys and clients
as a matter of law.  Arce v. Burrow,
958 S.W.2d 239, 246 (Tex. App.CHouston [14th Dist.] 1997) (op. on reh=g), aff=d as modified, 997 S.W.2d 229 (Tex. 1999).  The term fiduciary “‘refers to integrity and
fidelity.’”  Id. (quoting Kinsbach
Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509, 512
(1942)).  Therefore, the attorney-client
relationship is one of “most abundant good faith,” requiring absolute perfect
candor, openness and honesty, and the absence of any concealment or
deception.  Perez v. Kirk &
Carrigan, 822 S.W.2d 261, 265 (Tex. App.CCorpus Christi 1991, writ denied)
(citing Hefner v. State, 735 S.W.2d 608, 624 (Tex. App.CDallas 1987, pet. ref=d)). 


Tanox asserts it is “undisputed” the Lawyers did the acts
about which its complains; therefore, the primary dispute is whether those acts
constitute breaches of fiduciary duty under Texas law.  However, before we can reach that issue, we
must first determine whether an attorney-client relationship existed between
the Lawyers and Tanox.  See Yaklin v.
Glusing, Sharpe & Krueger, 875 S.W.2d 380, 383 (Tex. App.CCorpus Christi 1994, no writ) (stating
there must first be attorney-client relationship before duty arises).  








The attorney-client relationship is a contractual
relationship whereby an attorney agrees to render professional services for a
client.  Mellon Serv. Co. v. Touche
Ross & Co., 17 S.W.3d 432, 437 (Tex. App.CHouston [1st Dist.] 2000, no
pet.).  The relationship may be expressly
created by contract, or it may be implied from the actions of the parties.  Sutton v. Estate of McCormick, 47
S.W.3d 179, 182 (Tex. App.CCorpus Christi 2001, no pet.); Vinson & Elkins v.
Moran, 946 S.W.2d 381, 405 (Tex. App.CHouston [14th Dist.] 1997, writ dism=d by agr.).  The determination of whether there is a
meeting of the minds must be based on objective standards of what the parties
did and said and not on their alleged subjective states of mind.  Terrell v. State, 891 S.W.2d 307, 313
(Tex. App.CEl Paso 1994, pet. ref=d). 
A question of fact exists when the evidence does not conclusively
establish the existence of an attorney-client relationship.  Sutton, 47 S.W.3d at 182; Kanow v.
Brownshadel, 691 S.W.2d 804, 805B06 (Tex. App.CHouston [1st Dist.] 1985, no
writ).  

In support of its assertion that an attorney-client relationship
existed prior to the signing of the fee agreement, Tanox relies on selected
portions of the record.  First, Tanox
relies on evidence that the Lawyers worked on the trade secret litigation prior
to August 1994, and billed Tanox $600 for that work.  Joe Osborne of Akin, Gump testified Michael
Madigan requested that he review the time records in connection with the patent
infringement litigation.  Explaining that
he was not aware of the date of the fee agreement and that he gave no
consideration of the issue in his review of those records, Osborne included
work performed prior to August 1, 1994, in the bill for the patent infringement
litigation.  Osborne testified that had
he known of the date of the fee agreement, he would not have included that work
in the bill.  

Tanox also relies on Gerald Birnberg=s testimony that he worked on a
protective order in late July 1994, prior to the signing of the fee
agreement.  However, although Birnberg
worked on the protective order prior to August 1, 1994, he explained that
because the deadline for filing the motion was approaching, he performed
preparatory work, but not substantive work, so that if the Lawyers entered into
a fee agreement with Tanox, they would “be ready to step in and do the work on
the protective order in short order.” 
Tanox furthers points to Akin, Gump=s time records, which refer to Tanox
as the “client,” not the “prospective” client. 
Birnberg=s time entries, however, refer to Tanox as a “prospective
client.”  








Tanox=s chief executive officer, Nancy Chang, testified she thought
Birnberg was her attorney prior to entering into the fee agreement because she
trusted him and he helped put together a team of lawyers.  Chang=s further testimony, however,
contradicts her belief that Birnberg was already her attorney.  She testified “[Birnberg] certainly said he
wanted to be my attorney.  Robinson
wanted to represent us, excited about the case.”  In any event, Chang=s subjective belief that Birnberg was
her attorney is not relevant to this inquiry. 
The determination of whether there is a meeting of the minds is based
solely on objective standards of what parties did and said, not their alleged
subjective states of mind.  See
Terrell, 891 S.W.2d at 313.  

Tanox also argues a fiduciary relationship between an
attorney and his client extends to preliminary consultations concerning the
possible retention of the attorney.  See
Nolan v. Foreman, 665 F.2d 738, 739 n.3 (5th Cir. 1982).  In Nolan, the attorney was retained to
appeal a conviction for marijuana trafficking. 
Id. at 739.  The court
rejected the attorney=s argument that there was no attorney-client relationship
prior to reaching an agreement on the fee. 
Id. at n.3.  Instead,
observing that the parties may manifest an intent to create an attorney-client
relationship explicitly or by their conduct, the Nolan court found the
attorney=s fiduciary duties attached when he
entered into a discussion of the client=s legal problems “with a view toward
undertaking representation.”  Id. 

We find Nolan distinguishable from the facts of this
case.  For example, while the Lawyers and
Tanox were involved in the negotiation of the fee agreement, Tanox was still
considering other attorneys for representation. 
For example, on July 21, 1994, Anderson received a letter from Osborne
J. Dykes of Fulbright & Jaworski stating, “As per your request of Tuesday,
July 19, 1994, we have endeavored to prepare a preliminary proposal to Tanox
Biosystems, Inc. (>Tanox=) for the engagement of Fulbright & Jaworski L.L.P (>Fulbright & Jaworski=) to represent Tanox= interest in connection with the
referenced matter.”  








Moreover, the fee agreement states, “the attorneys have
agreed to provide such representation . . . subject to the following terms,
conditions, and understandings.” 
Anderson acknowledged that representation is conditioned upon agreeing
to the terms of the fee agreement.  In
other words, if the terms in the fee agreement are not agreed to then there is
no representation.  An attorney=s agreement to represent a client may
be conditioned on the negotiation of a fee arrangement.  Restatement
(Third) Law Governing Lawyers ' 14 cmt. e (2000).  The fee agreement also provides it was the
subject of negotiations, each party had the opportunity to consult with counsel
during negotiations, and there is no presumption of construction of the fee
agreement against either party.  Anderson
also conceded that these terms are evidence of arm=s-length negotiations.  

Furthermore, the evidence also showed Tanox would not allow
the Lawyers to review any information it considered proprietary until the
parties had signed the fee agreement. 
For example, Birnberg testified that although Tanox told the Lawyers its
1990 agreement with Ciba-Geigy provided royalties to Tanox, Tanox would not
allow the Lawyers to review that agreement because Tanox said it was “proprietary”
and “declined to make those documents available to [them] until they hired
[them] as their lawyers.”  Similarly,
Mike Mueller testified he did not have the impression that Anderson viewed him
as someone “to be trusted with confidential information prior to the August 1st
agreement” and, accordingly, Anderson would not give him any confidential
information until he was Tanox=s attorney.  

Finally,
on August, 1, 1994, Birnberg wrote Chang expressing his desire that the Lawyers
and Tanox would enter into a “successful” attorney-client relationship: 

Thank you for meeting with Ken Robinson, Mike Mueller,
and me to discuss possible representation of Tanox Biosystems, Inc. by Akin,
Gump, Strauss, Hauer & Feld, L.L.P., Robinson Law Firm, and Williams,
Birnberg & Andersen, L.L.P. in connection with the anti-IgE litigation with
Genentech, . . . After meeting with you and reviewing the materials we have
been provided, the three firms collectively feel sufficiently optimistic about
the prospects for a successful outcome of this litigation that we are willing to
undertake representation of Tanox in its affirmative claims against Genentech
and the others (the “trade secret litigation”) on a contingency fee basis.  Accordingly, on behalf of the three firms, I
enclose copies of two proposed Representation Letter Agreements which set forth
the terms upon which we would propose to undertake representation both in that
case and in the patent infringement litigation.

                                                                   *        *       
*

I look forward to hearing from you
and, hopefully, to a mutually rewarding and successful attorney-client
relationship.  








Because the evidence does not conclusively establish the
existence of an attorney-client relationship between the Lawyers and Tanox,
whether such a relationship existed was a question of fact for the
arbitrators.  See Sutton, 47
S.W.3d at 182; Kanow, 691 S.W.2d at 805B06. 
The arbitrators= finding that the Lawyers did not represent Tanox during the
negotiation of the fee agreement is not in manifest disregard of the law.  This issue is overruled.

                                        2.  New Business Arrangement Provision

Tanox contends the arbitrators= conclusion that the Lawyers did not
owe Tanox any fiduciary duties in connection with the preparation of the fee
agreement manifestly disregards Texas law requiring that an attorney must
inform the client of the basis of his rate or fee at the outset of the
matter.  See Levine v. Bayne, Snell
& Krause, 40 S.W.3d 92, 96 (Tex. 2001).[9]  Specifically, Tanox contends the Lawyers knew
the “new business arrangement” provision was ambiguous.  That is, the Lawyers believed they could
recover a percentage of the royalties Tanox was entitled to receive under the
1990 Ciba-Geigy agreement, while Tanox believed the Lawyers= fee was not based on those
royalties.  

In
support of this contention, Tanox relies on selected portions of a July 27,
1994, memorandum from Birnberg to Ken Robinson, which states:








It has suddenly and finally occurred to me (in the
shower this morning) what Tanox= hang-up is on the 10% versus 25% royalty issue and
I think they=re right.  The “settlement by new business arrangement”
we have been talking about would involve, essentially, Genentech taking over
Ciba Geigy=s position in the Tanox/Ciba “collaboration”
arrangement. . . .

The problem is that the Ciba-Tanox deal already
provides that Tanox is to receive a royalty from that existing
arrangement.  (I forget what the
percentage is, but think it [sic] to be around 8%).  If the litigation ends with Genentech simply
taking over Ciba=s position C and
nothing more C that Anew business arrangement@ would
have no incremental value (over and above what they already have) to Tanox
whatsoever, since they already have Ciba in that position and agreeing to pay
that royalty[.] Yet, under our fee agreement, we would be entitled to receive a
percentage of the royalties Tanox received from that “new business arrangement,”
notwithstanding the fact that they would be in exactly the same position they
are in right now and before the litigation (except for having a different “partner”
C Genentech rather than Ciba).  

Originally, David Anderson sought to address this
unfairness (to Tanox) by proposing that the percentage provided for in the
contingent fee agreement would be applied, but only to the portion of the
royalties which exceeds the amount they are presently entitled to under the
Ciba agreement.  You countered with a
proposal that the percentage be applied to the entire amount of royalties
received, whether those royalties result from our efforts or from Tanox= present contract with Ciba, but at a reduced rate of
10% (rather than the 25%-40% percentages which we are entitled to receive on “damages”
which are obtained for Tanox from our efforts).  Tanox agreed to your proposal in that
regard.  








Tanox is, in my judgment, entirely justified in
resisting paying us a fee based on what they are already entitled to receive
under the Ciba contract (even if Genentech takes over the Ciba position in the
Ciba contract).  We, on the other hand,
are entirely justified in requesting (demanding) a fee based on the amount by
which any royalties they become entitled to receive exceeds the amount they are
presently entitled to receive under the Ciba contract.  Unfortunately, straightening this out at this
stage to make it more reflective of what we should actually receive would
probably and rightly be perceived as “changing the deal”: we [you] said, we=ll take 10% of all royalties received (whether
from a new business arrangement or from a judgment against Genentech ordering
them to pay a “royalty” as damages), rather than 25% or 33a% or 40% or whatever of any new or increased
royalties Tanox becomes entitled to receive on account of our efforts.  Well, a deal is a deal; we made the deal and,
in my judgment, we should stick to it. 
Actually, I think it is entirely possible the “deal” may actually
work to our favor, rather than to our detriment, but only time will tell.  

Having said all that, my hope is that you can
explain it to Mike so that he will (a) not feel we are being “ripped off” by
the client (I don=t think we are on this issue; in fact, I think they
are essentially right) and (b) not tinker with the provisions of the draft
agreement in this regard.  My fear
is that if we try to “tie down” that the 10% applies to all royalties,
whether resulting from our efforts or otherwise, we will spook the client even
more and it just ain=t worth it.  I
think the agreement in its present form (in the section entitled Settlement by
New Business Arrangement) would sufficiently covers [sic] the situation by
entitling us to 10% of “any future payments (such as . . . royalties . . .)
received by Tanox on account of such new business arrangement.”  

In retrospect, we might have tried to distinguish
between “royalties” resulting from a new business arrangement and “royalties”
awarded by a court as damages after trial, but we didn=t and I think it is too late now to insist on (or even
propose) a different approach to this issue. 


If
what we end up with in this case is nothing more than Genentech taking over
Ciba=s position and nothing more
(and if world-wide sales amount to $1 billion per year and assuming an 8%
royalty in the current Ciba-Tanox agreement), the lawyers would receive $8
million per year for nearly 40 years for achieving nothing!  That=s not a bad deal.[10]  








Tanox claims Birnberg=s memorandum establishes that the
Lawyers knew there were conflicting interpretations.  Birnberg testified Robinson called him on
July 26, stating he did not understand why the Lawyers would recover only 10%
of the royalties awarded at trial instead of the incremental percentages they
would recover on other damages.  Robinson
wanted royalties awarded at trial to be distinguished from royalties recovered
though settlement.  According to
Birnberg, Anderson did not believe the Lawyers should recover the full
percentages on all royalties Tanox received from Genentech, but only on the
incremental difference between the royalties under the 1990 Ciba-Geigy
agreement and royalties recovered from Genentech.  Birnberg explained the problem with this
approach was that it was not possible to distinguish at what point Tanox would
receive incremental royalties as opposed to the base royalties under the
Ciba-Geigy agreement.  Therefore, it was
suggested as a compromise that the fee be based on 10% of all royalties
regardless of whether Tanox recovered the royalties under the Ciba-Geigy
agreement or from the trade secret lawsuit. 


Birnberg reminded Robinson the Lawyers had agreed to the
compromise.  Birnberg felt that trying to
craft a new deal in which the Lawyers would receive 25%, 33a% or 40% of royalties received from
Genentech rather than 10% of all royalties would be changing “the deal” at the
last minute.  Concerned Robinson would
try to renegotiate that provision with Anderson, Birnberg wrote this memo.  

Tanox argues the “tie down” language in Birnberg=s memorandum indicates the Lawyers
knew the provision was ambiguous. 
Robinson suggested to Birnberg that additional language was needed to “tie
down” the agreement that 10% applied to all royalties.  Birnberg, however, explained that after
rereading the draft of the fee agreement, he believed the language regarding
the Lawyers= recovery on royalties was
sufficiently clear.  Birnberg explained that
if the Lawyers tried to “tie down” something that was already clear, then Tanox
might believe the Lawyers were “reaching for something [they were] not really
reaching for.” 

Tanox further contends the Lawyers chose not to reveal to
Tanox their interpretation of the “new business arrangement” provision rather
than “spook the client.”  Birnberg
explained that Chang had called him the previous day because she was concerned
the Lawyers would recover fees on other Tanox programs such as its AIDS
program.  In light of this conversation
with Chang, Birnberg was concerned that trying to clarify the language would “play
right into the fear that Nancy had expressed to me the previous day, that was
going to spook them even more.”  








Moreover,
Birnberg testified the calculation of the fee on royalties was discussed with
Tanox at a meeting on July 19, 1994.  As
previously explained, Anderson did not believe the lawyers should recover the
full incremental percentages on royalties Tanox was already entitled to receive
under the Ciba-Geigy agreement; however, it was not possible to distinguish
royalties received under the Ciba-Geigy agreement from royalties received from
the Genentech litigation.  Robinson,
therefore, proposed that the Lawyers recover 10% of all royalties, both
royalties received from the Ciba-Geigy agreement and those received from the
collaboration with Genentech.  Indeed,
Birnberg=s July 27, 1994, memorandum supports
his testimony:

Originally, David Anderson sought to address this
unfairness (to Tanox) by proposing that the percentage provided for in the
contingent fee agreement would be applied, but only to the portion of the
royalties which exceeds the amount they are presently entitled to under the
Ciba agreement.  You countered with a
proposal that the percentage be applied to the entire amount of royalties
received . . . but at a reduced rate of 10% . . . .  Tanox agreed to your proposal in that
regard.  

Furthermore, in a conversation with Robinson on July 27,
Anderson confirmed the “new business arrangement” provision covered all
royalties.  Finally, a review of the
drafts of the fee agreement show numerous interlineations and deletions
supporting the Lawyers= assertion that this provision was negotiated by the parties.  The arbitrators= finding that the Lawyers were not
required to disclose that their fee was based on royalties received under the
1990 Ciba-Geigy agreement is not in manifest disregard of the law.[11]  This issue is overruled. 

                                                          3.  Conflict of Interest








Tanox claims the arbitrators= failure to find that the Lawyers
breached their fiduciary duty by creating, and failing to disclose, a conflict
of interest with respect to the settlement by new business arrangement and
their resulting fee is in manifest disregard of the law.  Tanox specifically complains the Lawyers Acould claim this windfall fee only if
they could settle the trade secret litigation as part of a new business
deal.  If the case had been tried to
judgment, however, the Lawyers could not possibly have claimed the windfall
fee.@ See Tex. Disciplinary R. Prof=l Conduct 1.04, cmt.6 (providing once the
attorney and his client have agreed to a fee arrangement, the attorney should
not handle the matter in such a way that furthers the attorney=s financial interests to the
detriment of the client).  Thus, Tanox
maintains that if the Lawyers had disclosed the conflict of interest, it could
have settled differently or tried the case to judgment.[12]  

Tanox=s purpose in suing Genentech belies its assertion that it
would have sought a different settlement or pursued the lawsuit to
judgment.  Genentech wanted to take
Ciba-Geigy=s place under the 1990 Ciba-Geigy
agreement for the development of the anti-body. 
Under Genentech=s proposal, however, Genentech would continue to develop its
own anti-IgE program in addition to collaborating with Tanox on its program,
thereby making Genentech both Tanox=s partner and competitor.  Birnberg explained that Chang and Anderson
were concerned the Tanox/Genentech program would be eliminated, leaving only
the development of Genentech=s product and, therefore, Tanox would not be getting “its
royalties on this part of the pie.” 
Birnberg testified Chang told him Genentech had offered to pay Tanox $25
million for taking Ciba-Geigy=s place, while still developing its own program, but Tanox
rejected the offer.  Chang wanted at
least $100 million.  Ultimately, Tanox
wanted an arrangement which would (1) allow Genentech to step into Ciba-Geigy=s shoes, and (2) provide leverage to
make collaboration with Genentech, which could result in the elimination of
Tanox=s program, economically viable for
Tanox.  Therefore, according to Birnberg,
the lawsuit was not filed with the expectation that it would ultimately go to
trial.








Anderson similarly testified one reason for filing the
lawsuit was to continue discussions about a possible business arrangement with
Genentech.  Eric Mirabel also testified
that with the threat of litigation, Genentech would be more willing to enter
into a settlement, which included a business deal with Genentech and the
settlement of Tanox=s patent rights.  

Tanox further asserts the new business arrangement bore no
relation to the lawsuit.  Chang=s own comments to Robinson negate
this assertion.  During settlement
negotiations, Chang persuaded Genentech to add a $20 million milestone payment
if they achieved $300 million in sales. 
In this regard, Chang said to Robinson: AKenny, you owe me a big tip.  I just got us a $20 million bonus when we get
to sales of $300 million.@  There would have been
no reason for Chang to make that comment if the new business arrangement had no
relation to the trade secret lawsuit.  

Finally, Tanox contends the Lawyers intended to claim large
fees if they could combine a settlement with a new business arrangement with
Genentech, even if the settlement Aachieved nothing.@[13] 
Birnberg acknowledged that from Tanox=s perspective, if all that was
achieved was Genentech stepping into Ciba-Geigy=s shoes, then nothing would have been
achieved, but the Lawyers would still recover a large fee.  Birnberg, however, explained Tanox=s surviving to receive $80 million
per year for 40 years would be possible only because the lawyers Awere there long enough to keep them
propped up to where they didn=t get quashed by Genentech, which is what their fear was,
then we would have earned that fee.@[14] 









Moreover, Chang understood the fees the Lawyers could recover
from a new business arrangement, when she told her former husband, Tse Wen
Chang, before the case settled that the lawyers could be entitled to $100 to
$200 million in fees.  The arbitrators= failure to find that the Lawyers had
placed their own interests ahead of achieving the best result is not in
manifest disregard of the law.  This
issue is overruled.  

                                                     4.  Litigation Against Tanox

Tanox claims the arbitrators manifestly disregarded the law
in finding the Lawyers no longer represented Tanox when they prepared to
litigate against Tanox and filed the motion to intervene seeking their attorney
fees in federal court on July 16, 1996, and, therefore, did not breach any
fiduciary duties.  With regard to this
conclusion, the arbitrators found (1) “Tanox had, without consultation,
supplanted the Lawyers with other counsel,” and (2) the trade secret litigation
had effectively ended on January 30, 1996. 


Tanox maintains the fact that Madigan directed an associate
at his law firm to look at the issue of possible litigation against Tanox over
attorney fees conclusively establishes the Lawyers were preparing to sue Tanox
while still representing Tanox. 
Beginning in February 1996, Madigan “had concerns” about Anderson, and
that by May 1996, he believed there could be a problem with the Lawyers= recovery of their fee.  Madigan=s concerns included Anderson=s (1) not wanting any of the Lawyers
to attend a meeting with him and Ciba-Geigy in Switzerland to discuss the new
business arrangement, even though Madigan and Birnberg had offered to go; (2)
wanting to draft the settlement documents without any assistance by the
Lawyers; and (3) evasiveness when Madigan attempted to discuss the mechanics of
the closing, which included wiring instructions.  








According to the Lawyers, after reaching the settlement on
January 30, 1996, all that remained was for Ciba-Geigy to agree to the new
business arrangement.  The Lawyers claim
they did not have any substantive involvement in the drafting of the settlement
documents.  Madigan stated he did very
little work on the litigation after the parties reached a settlement.  Anderson refused Birnberg and Madigan=s offer to attend a meeting with
Ciba-Geigy in Switzerland and to help draft the settlement documents.  Birnberg testified Anderson was the primary
draftsman for Tanox in preparing the settlement documents.  Anderson told Birnberg he had more knowledge
about biotech contracts, and he was an expert in contract negotiation.  Birnberg explained his only involvement in
the drafting of the settlement documents was in late May 1996, when Anderson
sent him a draft settlement agreement which was Ain nearly final form@ for his review.  Birnberg spent several hours reviewing the
draft and suggested minor, but not substantive, revisions.  This was the only time Birnberg saw any draft
of the settlement documents. 

In addition to their assertion that they had no substantial
involvement in the settlement after January 30, 1996, the Lawyers claim Tanox
had replaced them with other counsel in the drafting of the settlement
documents.  Tanox asserts it hired
another attorney, Bernard Saxe of Foley & Lardener, only to review a
provision in the business arrangement relating to Genentech=s opposition to one of Tanox=s patents in the European Patent
Office, not to handle any aspect of the litigation of which the Lawyers were
the attorneys of record.  Anderson,
however, also testified he had discussed the settlement agreement with Tanox=s former counsel, Ed Harrell.  

The parties signed the settlement agreement on July 8,
1996.  Madigan first learned about the
July 8 settlement when he read about it the newspaper.  Madigan discussed with Anderson and Genentech=s general counsel, David Beck, the
need to set up an escrow account. 
Madigan informed Anderson when the escrow account had been set up.  








Under the fee agreement, “Tanox expressly agree[d] that it
[would] not obtain any settlement nor receive any funds relating to this matter
without first consulting with and making full disclosure to the successor
attorneys.”  Unbeknownst to the Lawyers,
on July 12, 1996, Genentech wired $16 million to Tanox directly.  Madigan learned of the $16 million wire
transfer on July 15, from Genentech=s general counsel.  Madigan went to Robinson=s office, where he and Robinson
called Tanox.  Madigan informed Anderson
that he had learned of the $16 million payment. 
In response, Anderson told Madigan that he would have to check on the
wire transfer and they would have to discuss the amount the Lawyers would
recover.  

Madigan then wrote Anderson and requested that Tanox wire $6
million to Akin, Gump=s account and $2 million to Robinson=s account.  Madigan reminded Anderson that, Aour contract requires payment of
these additional funds >immediately= upon the receipt of the $16 million by Tanox.@ 
Madigan further warned the joint motion to dismiss would not be filed
until the Lawyers received the $8 million pursuant to the fee agreement.[15]  Robinson also wrote Anderson and Chang,
instructing them to wire $8 million to Lawyers, and further stating, AI cannot leave town or participate in
a dismissal Order [sic] of the case until our contract is honored and all
interest on $8,000,000 is paid.@ 

On July 16, in response to Madigan=s letter, Anderson informed Madigan
that Adetermining what was paid to settle
such litigation is fundamental to establishing the basis for calculation of the
contingent fee that is payable.@  Anderson explained
that Tanox asked Genentech to advise it of the amount for which it paid to
settle the trade secret litigation. 
Anderson states Genentech paid $7 million to settle the trade secret
litigation.  Therefore, according to
Anderson, the $16 million payment was not related to the settlement of the
trade secret litigation.  








Anderson
gave the Lawyers conflicting instructions. 
First, he ordered the Lawyers to file the dismissal papers.  However, he also advised Madigan the Lawyers
should have no further direct contact with Tanox, but, instead, Tanox had
retained Ed Harrell to represent it in concluding the settlement and in any
disputes with regard to the fee agreement. 
Anderson wrote:

[W]e believe that the threats made by you and Ken to
delay dismissal of the lawsuits until you have been paid are both highly
unethical conduct and constitute a breach of both our trade secret lawsuit and
patent litigation agreements. 
Unfortunately, it is now clear that Aour
attorneys@ have been working for their own interests, not Tanox=s.  Therefore,
Tanox demands that today you either sign and file the dismissals or withdraw as
Tanox=s counsel.

                                                                   *        *       
*

We are hopeful that conclusion of our agreements as
provided above can be quickly accomplished and we can end our relationship in
an amicable manner.  Finally, however, we
would like to let you know that based on the threats made by you and Ken and on
the adversarial position taken, we do not believe it is appropriate or
advisable for us to continue to deal directly with any of you in connection
with this matter and we have engaged Mr. Ed Harrell of Hughes, Watters &
Askanase to represent us in concluding the above and any other matters
which may arise in connection with the agreements between us.[16]

On July 16, 1996, the Lawyers filed under seal a motion to
intervene seeking attorney fees in connection with their work performed in the
trade secret litigation.  In its response
to the motion to intervene, Tanox stated, AThis case is settled and settlement
agreements [sic] executed by the parties. 
The form of the motion(s) and dismissal order(s) was agreed to by the
parties except Ciba-Geigy, and the remaining issue(s) are apparently virtually
resolved.  The dispute is solely between
TANOX and the Former Attorneys.@ 
(Emphasis added).  

On
August 1, 1996, Harrell wrote to David Donahoe of Akin, Gump, complaining that
Madigan, Robinson, and Birnberg had signed the motion to dismiss when they had
no authority to do so on behalf of Tanox as of July 15, 1996: 








I was surprised to learn that the signatures on the
dismissal motion of Madigan, Robinson and Birnberg were apparently the product
of a Mike Madigan request.  The adversarial
position of Tanox=s former attorneys became immutable on July 15, 1996.  The former
attorneys had no authority to speak or act on Tanox=s behalf.  Their
presumption to act on Tanox=s behalf is not only of grave concern but delayed the
filing of the dismissal papers.[17]  

After the settlement had been reached on January 30, Tanox
did not require the assistance of the Lawyers in obtaining Ciba-Geigy=s agreement to the settlement or in
drafting the settlement documents.  Tanox
used its in-house counsel and other outside counsel for those tasks.  After the Lawyers demanded payment of their
fees, but before it had filed the motion to intervene, Tanox informed the
Lawyers it had hired another attorney to conclude the settlement and to
represent it with regard to the fee agreement, and that the Lawyers should not
contact Tanox directly.  Tanox made it
clear to the Lawyers that as of July 15, the Lawyers no longer represented
it.  

Whether the Lawyers and Tanox still had an attorney-client
relationship was a question of fact for the arbitrators.  The arbitrators= finding that the Lawyers did not
breach any fiduciary duty by preparing to file and actually filing the motion
to intervene because the Lawyers no longer represented Tanox is not in manifest
disregard of the law.[18]  This issue is overruled.  

                                                               C.  Public Policy








Tanox further claims the award should be vacated because the
arbitrators= findings that the Lawyers did not
breach their fiduciary duty (1) violate public policy, and (2) are arbitrary
and capricious.  Tanox argues the
arbitrators= findings do not protect the
integrity of the attorney-client relationship, but, instead, condone an
attorney=s breach of fiduciary duty and
undermine the relationship of trust between attorneys and their clients.  There is no broad judicial power to set aside
an arbitration award as against public policy. 
Misco, 484 U.S. at 43. 
Therefore, the public policy exception is narrow and must satisfy
certain principles.  Eastern Assoc.
Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 63
(2000).  An arbitration award is
unenforceable on public policy grounds only when the award violates some A>explicit public policy=@ that is Awell-defined and dominant, and is
ascertained >by reference to the laws and legal
precedents and not from general considerations of supposed public interests.=@ 
W.R. Grace & Co. v. Local Union 759, Int=l Union of the United Rubber Cork,
Linoleum & Plastic Workers of Am., 461 U.S. 757, 766 (1983) (quoting Muschany v. United
States, 324 U.S. 49, 66 (1945)).  

An arbitration award will not be vacated as arbitrary and
capricious, unless it A>exhibits a wholesale departure from
the law [or] if the reasoning is so palpably faulty that no judge, or group of
judges could ever conceivably have made such a ruling.=@ 
Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d
1434, 1446 n.16 (11th Cir. 1998) (quoting Brown v. Rauscher Pierce Refsnes,
Inc., 994 F.2d 775, 781 (11th Cir. 1993)). 
In other words, the court will not vacate an award as arbitrary and
capricious unless it cannot infer any ground for the award from the facts.  Brown, 211 F.3d at 1223.  

If the court determines the arbitrators did not manifestly
disregard the law, then it should also conclude the award neither violates
public policy nor is arbitrary and capricious. 
See Gallus Invs., L.P. v. Pudgie=s Famous Chicken, Ltd., 134 F.3d 231, 234 n.* (4th Cir.
1998).  Because the arbitrators did not
manifestly disregard the law, its decision likewise neither violates public
policy nor is arbitrary and capricious. 
This issue is overruled.  

                                          D.  Fee Forfeiture Analysis & Damages

Tanox claims it is entitled to, on
remand, a fee forfeiture analysis under Burrow v. Arce for the attorneys= breach of their fiduciary
duties.  Burrow v. Arce, 997
S.W.2d 229, 246 (Tex. 1999).  Because of
our disposition of Tanox=s issues concerning breach of fiduciary duty, we need not
address this issue and it is overruled.  








                                               E.  Unconscionable Attorney Fees

Tanox claims the arbitrators manifestly disregarded the law
by not finding the Lawyers= fees to be unconscionable. 
An attorney may not charge an illegal or unconscionable fee.  Tex.
Disciplinary R. Prof=l Conduct 1.04(a).  A presumption of unfairness or invalidity
attaches to a fee agreement and the attorney bears the burden to prove the
agreement is fair and reasonable.  Archer
v. Griffith, 390 S.W.2d 735, 739 (Tex. 1964).  However, Aa fee arrangement negotiated at arm=s-length with an experienced business
client would rarely be subject to question. 
On the other hand, a fee arrangement with an uneducated or
unsophisticated individual having no prior experience in such matters should be
more carefully scrutinized for overreaching.@ 
Tex. Disciplinary R. Prof=l Conduct 1.04 cmt 8.  

The arbitrators found Tanox was a sophisticated party, which
was represented by competent counsel in the negotiation of the fee
agreement.  The parties agreed the fee
agreement was the subject of negotiations and that Tanox had the opportunity to
consult independent counsel during negotiations.  Similarly, Anderson acknowledged the fee
agreement was negotiated at arm=s-length.  Moreover,
Tanox understood the Lawyers could recover fees on all royalties received by
it.  Under these circumstance, no
presumption of unfairness attached to the fee agreement and, therefore, the
failure to find that the Lawyers= fees were unconscionable is not in
manifest disregard of the law.  This
issue is overruled.

                                              V.  Work
Product Privilege








Tanox claims the arbitrators
manifestly disregarded the law in sustaining the Lawyers= assertion of work product privilege
regarding documents and time entries the Lawyers prepared while they were
representing Tanox.  Under the FAA, the
courts have the authority to vacate an arbitration award A[w]here the arbitrators were guilty
of misconduct . . . in refusing to hear evidence pertinent and material to the
controversy.@ 
9 U.S.C. ' 10(a)(3).  This,
however, is a narrow ground for vacatur. 
An evidentiary error must not be merely an error of law; rather, such
error must so affect the rights of a party that it was deprived of a fair
hearing.  Forsythe Int=l, S.A. v. Gibbs Oil Co. of Tex., 915 F.2d 1017, 1023 (5th Cir. 1990)
(quoting Newark Stereotypers= Union No. 18 v. Newark Morning
Ledger Co., 397 F.2d
594, 599 (3d Cir. 1986)).  Assuming that
the arbitrators erred in refusing to consider the disputed evidence, to vacate
the arbitration award, the arbitrators= error must have been made in bad
faith or the error must be so gross as to constitute affirmative
misconduct.  Misco, Inc., 484 U.S.
at 40.  The arbitrator is the sole judge
of the admissibility and relevancy of the evidence submitted in an arbitration
proceeding.  Hoteles Condado Beach, La
Concha & Convention Ctr. v. Union De Tronquistas Local 901, 763 F.2d
34, 39 (1st Cir. 1985) (quoting M. Hill & A. Sinicropi, Evidence in
Arbitration 22 (1980)).  

Tanox claims the work-product privilege is not available to
the Lawyers because an attorney cannot anticipate litigation against a current
client without breaching his fiduciary duty. 
In this case, however, the arbitrators found the Lawyers no longer
represented Tanox at the time the subject documents were created.  Because that finding is not in manifest
disregard of the law, the arbitrators= decision not to order the production
of those documents also is not in manifest disregard of the law.  This issue is overruled.  

                                             VI. 
Essence of the Contract








Tanox claims the arbitration award fails to Adraw its essence@ from the fee agreement.  To draw its essence from a contract, an
arbitration award Amust have a basis that is at least rationally inferable, if
not obviously drawn, from the letter or purpose of the . . . agreement . . . .
[T]he award must, in some logical way, be derived from the wording or purpose
of the contract.@  Local Union 59,
Int=l Bhd. of Elec. Workers, AFL-CIO v.
Green Corp., 725
F.2d 264, 268 (5th Cir.), cert. denied, 469 U.S. 833 (1984) (quoting Brotherhood
of R.R. Trainmen v. Central of Ga. Ry. Co., 415 F.2d 403, 412 (5th Cir.
1969)).  When resolving disputes
concerning the application of a contract, and no dishonesty had been alleged on
the part of the arbitrator, an arbitrator=s A>improvident, even silly, factfinding=@ does not provide a basis for the
court not to uphold the award.  Major
League Baseball Players Ass=n, 532 U.S. at 509 (quoting Misco, Inc., 484
U.S. at 39).  If the arbitrator is even
arguably construing the contract and acting within the scope of his authority,
the fact that the court is convinced he committed serious error is not
sufficient to vacate the award.  Id.
(quoting Eastern Associated Coal Corp. v. United Mine Workers of Am.,
531 U.S. at 62).  In other words, as long
as the arbitrators= decision draws its essence from the contract, the award must
be confirmed.  Misco, Inc., 484
U.S. at 36.  

Tanox contends the arbitration award fails to draw its
essence from the fee agreement for two reasons. 
First, the arbitrators ignored the fact that the attorney fees based on
Tanox=s recovery under a new business
arrangement were limited to payments Areceived by Tanox as a result of
the litigation, on account of such new business arrangement.@ 
(Emphasis added).  Tanox complains
the arbitration panel erroneously found the new business arrangement was a
result of the trade secret litigation and, therefore, the attorneys were
awarded fees based on preexisting royalties and patent licensing fees which had
no relation to the trade secret litigation.[19]  








Anderson testified the trade secret litigation was not a
consideration with regard to the new business arrangement among Tanox,
Genentech, and Ciba-Geigy.  Anderson,
however, further testified the dispute, which included the patent infringement
and trade secret litigation, was resolved by a new business arrangement and Athe settlement recovery could
certainly include the best business deal that was based on . . . that lawsuit.@ 
Birnberg similarly testified the parties agreed the settlement of the
disputes concerning Tanox=s patent rights and the merger of the Genentech and
Tanox/Ciba-Geigy anti-IgE projects were part of the settlement of the
litigation pending among Genentech, Tanox, and Ciba-Geigy.  Birnberg further testified the merger of the
anti-IgE projects was a new business arrangement within the meaning of the fee
agreement.  Tse Wen Chang likewise
testified he could not think of any way the litigation could be settled by a
new business arrangement that would not be based on the patents.  

Second, Tanox contends the fee agreement limits the type of
future payments on which attorney fees can be calculated to payments Areceived from the defendants.@ 
Tanox argues because Ciba-Geigy was not a defendant in the trade secret
litigation, attorney fees cannot be based on royalty payments existing under
the 1990 Ciba-Geigy agreement.  The fee
agreement Acontemplated that the dispute between
Tanox and the defendants might be resolved (in whole or in part) by some
business arrangement whereby Tanox and one or more defendants engage in
business together . . . .@  This provision does
not limit a new business arrangement to Tanox and Genentech only.  It merely states the dispute may be resolved
by Tanox and Genentech engaged in business together, but does not exclude the
possibility that Tanox and Genentech would do business with a third party.  The arbitrators= award draws its essence from the fee
agreement.  This issue is overruled.  

                                VII. 
Arbitration of Tanox=s Tort
Claims








Tanox claims the trial court erred in submitting its breach
of fiduciary duty and other tort claims to arbitration because the fee
agreement provided arbitration for claims relating only to the breach of the
fee agreement, not tort claims.  Both
federal and state law favor the arbitration of disputes.  In re American Homestar of Lancaster, Inc.,
50 S.W.3d 480, 484 (Tex. 2001).  A party,
however, cannot be compelled to submit to arbitration a dispute he has not
agreed to submit.  PaineWebber Inc. v.
Chase Manhattan Private Bank (Switz.), 260 F.3d 453, 462 (5th Cir.
2001).  On the other hand, any doubts
concerning the scope of arbitrable issues, should be resolved in favor of
arbitration.  Moses H. Cone Mem=l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24B25 (1983); Valentine Sugars, Inc.
v. Donau Corp., 981 F.2d 210, 213 (5th Cir.), cert. denied, 509 U.S.
923 (1993) (explaining that in determining whether arbitrator exceeded
jurisdiction, court resolves all doubts in favor of arbitration).  Therefore, A>unless it can be said with positive
assurance that an arbitration clause is not susceptible of an interpretation
which would cover the dispute at issue,=@ arbitration should not be
denied.  Neal v. Hardee=s Food Sys., Inc., 918 F.2d 34, 37 (5th Cir. 1990)
(quoting Commerce Park at DFW Freeport v. Mardian Constr. Co., 729 F.2d
334, 338 (5th Cir. 1984)).

Tanox
contends the fee agreement limits arbitration to issues involving breach of the
agreement.  The arbitration clause
states:

Any actual or potential breach of this agreement by a
party is to be brought to that party=s
attention promptly.  Upon request of a
party, a meeting shall be convened among the parties to attempt to resolve any
issues relating to such actual or potential breach.  If the parties are unable to resolve such
issues or if the parties cannot resolve any other issues which may
require further negotiations and agreement, any party may, by written request,
require that any such unresolved issues be submitted to binding arbitration . .
.

Contrary to Tanox=s assertion, we conclude the
inclusion of the language Aany other issues which may require further negotiations and
agreement@ in the arbitration clause is broad
enough to include related tort claims.  








In any event, a review of the record reflects that Tanox
specifically requested that its breach of fiduciary duty and other tort claims
be submitted to arbitration.  For
example, in its motion to compel arbitration, Tanox states, A[t]he representation agreement (p.11)
requires arbitration of all disputes between Former Attorneys and TANOX.@ 
(Emphasis added).  Moreover, in a
written notice to the Lawyers, Tanox specifically demanded arbitration of Athe enumerated claims,@ including claims for breach of
fiduciary duty and legal malpractice.  AA claimant may not voluntarily submit
his claim to arbitration, await the outcome, and, if the decision is
unfavorable, then challenge the authority of the arbitrators to act.@ 
Ficek v. Southern. Pac. Co., 338 F.2d 655, 657 (9th Cir. 1964); see
also Bull HN Info. Sys., Inc., 229 F.3d at 332 (stating A>the arbitrator=s interpretation of the scope of the
issue submitted to him is to be treated with great deference= and >must be upheld so long as it is
rationally derived from the parties= submission=@) (citations omitted).  Accordingly, Tanox is estopped to argue that
its tort claims were not arbitrable.  

Tanox argues that even though it initially asked for
arbitration of all disputes with the Lawyers, including its tort claims, it is
not estopped to assert that these claims were not subject to the arbitration
agreement because it did not have knowledge of all its claims at the time it
requested arbitration.  Tanox, however, recites
in detail many of the facts giving rise to its claims for breach of fiduciary
duty and legal malpractice in its written demand for arbitration.  Therefore, it is evident that Tanox was
sufficiently aware of the facts underlying its breach of fiduciary duty and
other tort claims at the time it demanded arbitration. 

Finally, Tanox argues that as a matter of public policy, a
client=s breach of fiduciary duty and legal
malpractice claims should never be the subject of arbitration, absent special
protection.  Tanox, therefore, asks this
court to declare the arbitration agreement void as a matter of public
policy.  The San Antonio Court of Appeals
rejected this argument, explaining that such Apublic-policy contentions are
unfounded because well established caselaw favors mandatory arbitration and
holds that arbitration does not deny parties their right to a jury trial, as a
matter of law.@ 
See Henry v. Gonzalez, 18 S.W.3d 684, 691 (Tex. App.CSan Antonio 2000, pet. dism=d by agr.).[20]  Moreover, the fee agreement negotiations were
at arm=s-length as Tanox had the benefit of
representation by independent and experienced legal counsel.  Tanox=s tort claims were properly submitted
to arbitration.  This issue is overruled.


                 VIII. 
Summary Judgment for Individual Defendants








Tanox claims the trial court erred in granting summary
judgment in favor of the Individual Lawyers on the affirmative defenses of res
judicata and collateral estoppel.  For
the reasons set forth in the concurring opinion on rehearing, this issue is
overruled by a majority of the panel.

                                                            IX. 
Conclusion

We conclude the trial court did not err in granting the
Lawyers= motion to confirm the arbitration
award and in denying Tanox=s motion to vacate the arbitration award.  Accordingly, the judgment of the trial court
is affirmed.  

 

 

/s/        J. Harvey Hudson

Justice

 

 

 

Judgment rendered and Opinion on Rehearing and
Concurring and Dissenting Opinions on Rehearing filed April 24, 2003.

 

Panel consists of Justices Hudson, Fowler, and
Edelman.  (Fowler, J., Concurring on
Rehearing on Part VIII, joined by Edelman, J.) 
(Hudson, J. Dissenting on Rehearing of Part VIII of Opinion on
Rehearing.)











[1]  Tanox and the
law firms, Akin, Gump, Strauss, Hauer & Feld, L.L.P., the Robinson Law
Firm, and Williams, Birnberg & Andersen, were the parties to the fee
agreement.  Although the Individual
Lawyers, Michael Madigan, Michael Mueller, Kenneth Robinson, and Gerald
Birnberg, were not parties to the agreement, for the purposes of simplicity, we
will refer to the law firms and the Individual Lawyers as Athe Lawyers.@  The Lawyers and Tanox entered into a separate
hourly fee agreement with regard to Genentech=s patent
infringement claim against Tanox.  





[2]  Although
the arbitrators found Tanox had purposely concealed from the Lawyers its
receipt of $16 million from Genentech on July 12, 1996, and collaborated with
Genentech in an effort to avoid its contractual obligation to pay the Lawyers
the first $8 million received, the arbitrators found Tanox did not commit
actionable fraud because the Lawyers did not rely on Tanox=s
misrepresentations to their detriment. 





[3]  9 U.S.C. ' 1, et seq. (1999 & Supp. 2001).





[4]  But see UHC
Mgmt. Co. v. Computer Scis. Corp., 148 F.3d 992, 997 (8th Cir. 1998)
(stating A[i]t is not clear, however, that parties have any say
in how a federal court will review an arbitration award when Congress has
ordained a specific, self-limiting procedure for how such a review is to occur@). 





[5]  Bull HN
Info. Sys., Inc. v. Hutson, 229 F.3d 321, 331 (1st Cir. 2000).





[6]  Misco, Inc.,
484 U.S. at 42.





[7]  Brown v.
ITT Consumer Fin. Corp., 211 F.3d 1217, 1222 (11th Cir. 2000).





[8]  In reaching
that conclusion, the arbitrators explained:

                        The evidence persuades us
that the Lawyers did not represent Tanox in the negotiation of the CFA and that
Tanox did not look to or rely on the Lawyers for legal advice in the
negotiations of the CFA.  The weight of
the evidence establishes that Tanox was represented by attorney David Anderson,
Tanox=s executive vice president and chief operating
officer, in the negotiations of the CFA. 
Mr. Anderson was intimately involved in every aspect of the very lengthy
negotiation process.  





[9]  The
arbitrators found Tanox was represented by counsel in the negotiation of the
fee agreement.  Specifically, the
arbitrators observed that Tanox=s legal counsel, Anderson, was Aintimately involved in every aspect of the very
lengthy negotiation process@ and that Anderson=s Acompetence and level of sophistication in that
undertaking was comparable to that of the Lawyers.@  In this
regard, the arbitrators found Ait difficult to believe that Mr. Anderson would have
permitted Tanox=s chief executive officer to sign an agreement which
contained provisions which, as Tanox contends, Mr. Anderson did not understand
or which a competent attorney would know or should know to be illegal or
unconscionable.@  

Noting the fee agreement provides Tanox
has availed itself of legal representation independent of that of the
attorneys, the arbitrators stated, ATanox=s contention that it relied on representations of the
Lawyers rests on the supposition that neither its chief executive officer, Dr.
Nancy Chang, nor its executive vice president and chief operating officer,
David Anderson, knew the plain meaning of this plain language or were so naive
as to believe it to be meaningless.  The
credible evidence simply does not support this supposition.@  Instead, the
arbitrators found that the evidence established that the fee agreement was
negotiated at arm=s-length by sophisticated parties of comparable
knowledge and bargaining power, rejecting ATanox=s assertion that it was unsophisticated, inexperienced
or reliant on the Lawyers.@  





[10]  Emphasis in
original.  





[11]  Tanox
further argues the fee agreement is voidable because it violates several rules
of professional conduct.  See Tex. Disciplinary R. Prof=l Conduct 1.02, 1.03,
1.04, 1.06, and 1.08, reprinted in Tex. Gov=t
Code Ann., tit. 2, subtit G app. A (Vernon 1998) (Tex. State Bar R. art. X, '
9).  While generally citing several rules
of professional conduct, Tanox has failed to present any argument in support of
this assertion, thereby waiving this complaint on appeal.  Tex.
R. App. P. 38.1.  





[12]  The
arbitrators stated, AIn summary, nothing presented by Tanox persuades us
that Tanox did not achieve precisely the deal it desired and knowingly sought.@  





[13]  This is in
reference to Birnberg=s July 27, 1994 memorandum in which he states:  

If what we
end up with in this case is nothing more than Genentech taking over Ciba=s position and nothing more (and if world-wide
sales amount to $1 billion per year and assuming an 8% royalty in the current
Ciba-Tanox agreement), the lawyers would receive $8 million per year for nearly
40 years for achieving nothing! 
That=s not a bad deal.

(Emphasis in original).





[14]  The
following exchange occurred between Birnberg and one of the arbitrators:

Arbitrator
Hoover: Can I ask a question here?  Are you saying when you say nothing here,
what you mean is what might appear to be nothing?

[Birnberg]:
Yeah, absolutely, nothing from their perspective.  They would say, AOh,
well, we ended up with the same thing as you got before.@  It=s
still achieving something.  It would have
achieved a whole lot, by the way.  It
would have achieved having the benefit of Genentech=s
far superior marketing, having the benefit of Genentech=s
scientists, having the benefit, perhaps, of Genentech not being in the market
as a competitor. . . .





[15]  Madigan
wrote:  AThe
joint motion and dismissal order have not yet been filed.  We=re
still awaiting the finalized documents. 
These documents will not be filed until we receive confirmation
of the wire transfer of the funds.@  (Emphasis in original).  





[16]  Emphasis
added.





[17]  Emphasis
added.  





[18]  Tanox complains
the Lawyers= preparation of documents in anticipation of
litigation is tantamount to an admission that they breached their fiduciary
duty.  See Resolution Trust Corp. v. HC, P.C., 128
F.R.D. 647, 649 (N.D. Tex. 1989) (stating that any claim by attorney that
materials were created in anticipation of litigation with client would be an
admission of a breach of fiduciary duty). 
However, because the arbitrators determined the Lawyers no longer
represented Tanox by that time, the preparation of those documents does not
constitute a breach of the Lawyers=
fiduciary duty.  





[19]  The arbitrator
explained the new business arrangement was an integrated whole, with dependent
promises and conditions.  ATanox attempted in argument to exclude certain
elements from the purview of the new business arrangement by classifying them
for fee purposes as not >results of the litigation.@  However, A[n]othing in the general language of the [fee
agreement] suggests the propriety of a >cafeteria= approach.  If
Tanox had wanted to carve out exceptions, . . . it had the burden to do
so.  The [fee agreement] does not
contemplate a divisible >settlement.=@  





[20]  But
see id. at 693 (Hardberger, C.J., dissenting)
(expressing concerns that applying general contractual principles to
arbitration agreement in context of attorney-client relationship ignores
reality that attorney and client are not in most instances engaged in arm=s-length
transaction during initial negotiations).